SNOOK *v.* THE STATE OF OHIO.

(Decided November 22, 1929.)

*Mr. Arthur C. Fricke, Mr. E. O. Ricketts* and *Mr. John F. Seidel,* for plaintiff in error.
*Mr. John J. Chester, Jr.,* prosecuting attorney,

*Mr. Myron B. Gessaman, Mr. Paul C. Hicks* and *Mr. Robert J. Odell,* for defendant in error.

HORNBECK, J.   Plaintiff in error was convicted of murder in the first degree, without recommendation of mercy, and sentenced to death.   From this judgment error is prosecuted.

The parties will be referred to in this opinion as they appeared in the trial court.

Twenty-six grounds of error are set forth in the petition, all of which have been considered.   In the oral argument and in the briefs of counsel for defendant, three of this number are urged, to which we direct our especial attention.   They are:   (1) Refusal of the trial court to grant the motion of the defendant for a continuance; (2) error of the court in the charge to the jury relating to confessions; (3) misconduct of prosecuting attorney in his closing argument to the jury.

Refusal of Court to Grant Motion for Continuance.

On the 10th day of July, 1929, counsel for defendant filed a motion seeking to have the trial date set forward from July 22 to a later period, on the ground that the ends of justice required such continuance.   Hearing on the motion was specially set, and in support thereof the defendant offered affidavits of Dr. John H. Berry and Dr. George Heffner, alienists, to the effect that it would be necessary, if a proper determination were to be made of the mental state of the defendant, that they should be given an opportunity of observing him for a period of 60 days.   Affidavits of E. O. Ricketts and John F. Seidel, counsel for defendant, were also sub-

mitted, setting forth the unfavorable state of the public mind in Columbus and vicinity toward the defendant, induced by the great amount of publicity which had been given the case by newspapers, and otherwise. The state offered counter affidavits of Drs. Wm. H. Pritchard, Earl E. Gaver, and Robert C. Tarbell.

At the hearing Drs. Berry and Heffner were present, and the court, on its own motion, interrogated them at great length. Most careful and painstaking effort was made by the court to secure all available information touching the subject-matter of this motion, and, after so doing, overruled it, holding against the contention of the defendant as to both matters urged. In this determination the court was clearly within its discretionary rights, and we would be justified in sustaining the action upon that ground alone. But we are of opinion that the court was correct in holding that no proper showing was made to justify the continuance of the case so that the alienists might have further time to observe the defendant. There was nothing in the affidavits of the alienists tendered, nor in their testimony, which even suggested the legal insanity of the defendant, and from that time, until the motion for a new trial was filed, no such claim was made or brought to the attention of the trial court. More than 60 days elapsed from the time these alienists first examined the defendant until the motion for a new trial was filed, during which time examination and observation could have been made of him, and a finding reached, which could have been brought to the attention of the court as newly discovered evi-

dence as late as the date of the filing of the motion for a new trial. Under our new Criminal Code, it is required that criminal causes be assigned within 30 days from the date of arraignment, and not continued unless the ends of justice so require. Although this case followed the procedure of the old law, the action of the court in setting the case for prompt trial was in accord with the spirit of the new Code toward prompt determination of criminal causes.

The court likewise was justified in holding that it did not appear that it was improbable that a fair jury could be selected in Franklin county, and no request was made for a change of place of trial to an adjoining county.

Theora Hix was killed on the 13th of June, 1929. The defendant was indicted for her murder on the 21st of June, arraigned on the 24th, and date of trial fixed for July 22d, which was later postponed to the 24th of July, when the selection of the jury began. The case from the time the body of Miss Hix was found aroused widespread interest. The harrowing details of the murder, the prominence of the defendant, his connection with a great university, his confession, the eternal triangle, and the suggestion of a sex crime, all combined to make a great part of the public eager for information touching the tragedy. This demand the press met with the characteristic expedition and thoroughness of the modern metropolitan newspaper. This is a condition that will attend every such occurrence, and it is impossible to find any great number of intelligent people who do not read the newspapers. It is now, and always has

been, the law that a prospective juror is permitted to determine his own state of mind. Thus, if such a juror indicates that he is free from bias or prejudice, and can start fairly in his attitude toward the defendant, and toward the state, he is qualified in that respect. The court held in passing on the motion for a continuance that he was not convinced that a suitable and proper jury could not be secured, but that, if at the time of the trial such a condition developed, the motion for continuance would be given further consideration. Upon the selection of the jury at the time of the trial, the widest latitude was extended to counsel in determining the qualifications of prospective jurors. Seven days were given, and 1,000 pages of record were made on this subject alone. Notwithstanding the unusual prominence that this case had assumed in the public mind, it was necessary to examine 107 persons only, from which were chosen 14 jurors, all of whom announced their willingness and ability to act fairly, and independent of any outside influence.

Misconduct of Prosecuting Attorney in his Closing
Argument to the Jury.

We consider the third error urged by defendant before taking up the second ground. In the final argument to the jury, the prosecutor employed certain violent and abusive language toward the defendant, and likened his case to that of Leopold and Loeb, spoke of the gang warfare in Chicago, called upon the jury to take up the burden which the prosecutor had carried to that time, stating that that burden carried with it the reputation of the state of Ohio, the Ohio State University, and Frank-

lin county, the reputation of the city of Columbus, and of the common pleas court of Franklin county, and made other remarks of like character. At the conclusion of this speech, the record shows that there was general clapping of hands in the audience. No objection was made by counsel for defendant to the remarks of the prosecutor, no exception was taken, nor motion made to strike them from the record and withdraw them from the attention of the jury. (See *Ohio & Western Pa. Dock Co.* v. *Trapnell,* 88 Ohio St., 516, 521, 103 N. E., 761, which, though a civil action, states the rule which governs a reviewing court in reference to argument of counsel generally.)

The court very promptly quelled the disturbance in the courtroom. Inasmuch as counsel did not deem the remarks of the prosecutor of sufficient consequence to direct the court's attention to them, and thereby permit the withdrawal of so much of this language as was improper, we can only determine that it was prejudicial error in the event that the language was so flagrant and prejudicial in itself that its use amounted to a denial of justice to the defendant which could not be corrected. In view of the admonition of the court in its general charge touching the obligation of the jury to disregard every extraneous influence, and to consider only the evidence which had been brought to its attention in reaching a verdict, even though much of the language was unfortunate, and should have been stricken on motion, we cannot say that it was manifestly prejudicial to the defendant, and the same conclusion must be reached concerning the few seconds of applause.

It has been suggested that this applause was a result of the placing of individuals in the courtroom for the purpose of making such a demonstration, but this is not sustained by the record. The prosecutor was prompt in asking the court to instruct the jury to disregard the action of the spectators, and there is nothing to indicate that the representative of the state had anything whatever to do with the unfortunate outbreak.

Error of the Court in the Charge to the Jury Relating to the Confessions.

The defendant signed a written confession, made up of stenographic notes, to which his name was appended at the end. This statement was prepared and signed at about 1 o'clock p. m. on Thursday, June 20, 1929. A few minutes after midnight of the same day, the defendant made other statements, known as a second confession, to William C. Howells and James E. Fusco, who were representatives of a number of newspaper reporters. This confession was given from the cell at the county jail, wherein the defendant was imprisoned, to the reporters above mentioned, in the presence of Sheriff Harry Paul, Deputy Sheriff Ralph Paul, and Mr. Garek, an assistant prosecutor.

The prosecutor, in his opening statement to the jury, used part of the second confession to indicate what he expected the evidence to prove. No objection to these statements was made by counsel for defendant at the time. The state in its case in chief introduced through the witnesses Howells and Fusco the second confession, which was made up entirely of oral statements in the form of questions and

answers. The defense, at the time Mr. Howells was on the stand, who was the first witness through whom the second confession was sought to be introduced, objected to the admission of the testimony because it was not voluntarily given, and in the first instance indicated a purpose to submit this question to the trial judge. The court ruled that this was a right to which the defendant was entitled, and that it would be heard and decided by him in the absence of the jury. Thereafter, counsel for defendant changed their position in this regard, and agreed that the question of the admissibility of the confession should be determined by the jury under proper instructions as to the law from the court. It is insisted by defense counsel that they were forced to take this latter position because the jury had been permitted to hear material statements from the confessions in the prosecutor's opening remarks. This claim is not tenable, because counsel must have known when the prosecutor entered the field of the confession, and had opportunity then to insist that the admissibility of the confession be first determined before the jury be permitted to hear it. Failing to avail themselves of this opportunity at a seasonable time, they cannot now be heard to say that they were prejudiced thereby. The first confession was not introduced, as such, until the state produced it in rebuttal. The defendant, in his testimony, admitted practically all of the material facts included in both confessions, except the severing of the jugular vein and the carotid artery, and any attempt to puncture the eardrum. On cross-examination, the defendant was asked at great length

whether or not he had made certain statements which were afterwards testified to as a part of the first confession, including those with respect to the use of the knife, most of which he denied.

At the conclusion of the court's charge, counsel for defendant took the following exceptions:

"The defendant excepts to the charge as given.

"The defendant excepts to the entire charge and every part of the charge relating to the admissions and confessions and to the failure of the court to charge that certain alleged admissions were only offered for the purpose of impeachment and for the purpose of showing a confession; in other words, the court did not distinguish between the alleged confessions which were made or alleged to have been made in the county jail, and the alleged admissions which were made or are alleged to have been made in the presence of police officials in the offices at Police Headquarters."

A great portion of the evidence in this case relates to the question whether or not either or both confessions were voluntarily made by the defendant, and the evidence was susceptible of determination in favor of the position of the defense or of the state.

The first confession was signed about 1 o'clock p. m., Thursday, June 20th. It was the culmination of continued examination over a period of approximately 24 hours. On Wednesday, at about 1 p. m., the defendant was taken from his cell in the county jail across the city to police headquarters, and soon thereafter his interrogation was there begun. At times Prosecutor Chester, Chief French, Chief Shellenbarger, Detectives Phillips, Lavely, and McCall,

and Mr. Hix, father of Theora Hix, were in the room with the defendant. Until about 6 p. m., Wednesday, he was questioned by some of these officers, singly and collectively. He was then permitted to have a sandwich, a glass of milk, and an orange. During the time he was eating, his questioners remained in the room, and the subject of the inquiry was pursued. From that hour, throughout all of the night of Wednesday, until early morning, the defendant was subjected to continued query. It is admitted that he was cursed by Detectives Phillips and Lavely, and that they assumed a menacing attitude toward him on occasions.

Finally, early in the morning, about 7 o'clock of Thursday, after the defendant had been removed to the county jail, upon his request, one of his attorneys, Judge Seidel, was called, and he was permitted to confer with him a very short time. This conference was terminated abruptly, and the defendant was again interrogated. His attorney was permitted to be present, but soon thereafter was ordered from the room. It is stated by the defendant that, when he and his attorney had come into the room, following their conference, both his counsel and defendant stated that defendant had nothing further to say; that he desired to remain silent, and did not want to proceed with any further statements. The defendant claims that during Wednesday night he had requested that the questioning be stopped, but that Detective Phillips informed him that they would quit when they got ready. Soon after the defendant's attorney was ejected from the room the prosecuting attorney struck the defendant in the

face four or five times, at least three times with the fist, the defendant says.

This brief statement of the occurrences leading up to the first confession is sufficient to demonstrate that the defendant had grounds to insist that his confession was not voluntarily made, but that it was induced by improper influence, suggestion, threats, menacing attitude, and violence. The state contended, and had much evidence to support its claim, that the confession came as a result of an appreciation by the defendant that he had made such statements in connection with the facts in the possession of the state that it was futile for him to attempt longer to deny his part in the killing. The state also claimed and had evidence tending to show that the defendant was not intimidated, nor unduly influenced.

Soon after midnight on Thursday, the date of the first confession, defendant was awakened in his sleep, and the sheriff inquired of him if he would see the newspaper reporters. He replied that he did not want to dress, but that he would talk to two of them in his cell. The sheriff states that he said to the defendant that he was not required to talk to reporters, and that he would not ask him to do so against his will. Mr. Howells and Mr. Fusco, together with Mr. Garek, an assistant prosecutor, the sheriff, and Deputy Sheriff Ralph Paul, went into the cell of the defendant, and thereupon the so-called second confession was given. The defendant says that he was told by the first men of the party who entered the cell that they had come from the prosecutor's office. There is no other or further suggestion of

any undue influence exercised upon the defendant at that particular time. However, it is claimed by the defense that the undue influence which had operated to produce the first confession was still effective, and an inducing cause of the second confession. Some days prior to the confessions, counsel for defendant went to the county jail, and sought the privilege from the deputy sheriff in charge of conferring with their client. This was refused, unless and until such interview was approved by the prosecuting attorney. Thereupon counsel applied to and received from a judge of the common pleas court a mandatory injunction requiring the sheriff to permit defendant's counsel to visit him at all proper times. This injunction was effective at all times up to and including the time of the second confession.

The court charged the jury on the subject of confessions at considerable length. On several occasions during the trial, the observation was made by the court, that, it appearing that statements amounting to a confession had been proven, the burden of showing the confession was involuntarily given was upon the defendant. This proposition was acceded to by defendant's counsel. The court charged, in so far as pertinent to our question:

"A confession can not be received and considered unless it was freely and voluntarily made. This means that the confession must not be obtained by any sort of threat or violence, nor by any promise, either direct or implied, nor by the exertion of any undue influence, but unless it appears that the confession was so inspired, it may be presumed to be voluntary. The State, offering the confession or

confessions, must prove that they were made, but the burden of proving that a particular confession was obtained by improper inducements is upon the defendant.

*"If any improper inducements are proven, an inference thereupon may be drawn that the confession was involuntary,* but the ultimate question for your determination is whether or not such improper inducements did in fact cause the confession, or confessions to be made, or whether such confession or confessions was or were the free and voluntary act of the accused. All the surrounding circumstances, the defendant's strength or weakness of mind, his knowledge, his demeanor, etc., must be looked to by you to determine whether he was affected by the promises or threats, if any, and made the confession or confessions as a result of such undue influence, or freely and voluntarily.

"Consider separately the circumstances under which each of the alleged confession or confessions were made by the defendant. If you find any or all of the confessions to be involuntary, you will entirely disregard any such confession or confessions. This rule is based upon the belief that confessions so extorted are untrue, or at least unreliable, and therefore must be rejected."

It is insisted by counsel for the defense that this charge was manifestly prejudicial to the defendant, in that it did not give sufficient consideration to the admitted acts of violence of the prosecutor upon the defendant, that the court should have charged, inasmuch as the confessions, and particularly the first confession, were made in the presence of police of-

ficials and other officers having authority over the defendant, that the confession must be presumed to have been involuntarily made and, further, that as to the second confession any influence incident to the first confession resulting in involuntary statements by the defendant must be presumed to continue and be present and effective in any subsequent confession, unless it clearly appears that the effect of such influence had been removed. The authority relied upon is *Spears* v. *State,* 2 Ohio St., 583: "The question in every case where a confession has followed representations or threats, is, was it thus produced? * * * But in deciding it, he is to have regard to the following rule, namely, that if the representations or threats were made by, or in the presence of, a person having authority or control over the prosecution of the accused, it is presumed that the confession was produced by such representations or threats, unless it appear that their influence was totally done away before the confession was made."

This proposition of law is well established in Ohio, and is supported by the great weight of authority. 16 Corpus Juris, 722, 723. A general exception to a charge reaches only such error as has been committed by the court in enunciating the law of the case.

The writer of this opinion is of the belief that the rule before quoted, as enunciated in the *Spears case,* should have been incorporated in the charge, and that without it there was not a correct statement of the law by which the jury was to be guided in determining the voluntary or involuntary character of the

confessions; that the jury, acting as and for the judge, should have been informed of this rule, which he would have been compelled to apply had he determined the question of the admissibility of the confession, and that the exceptions as saved by the defendant reach the error. My associates are of the opinion that the charge as given is sound in every particular. It is exact in defining the requisites of a confession, and the burden of proof is properly placed. Defendant's counsel, with full knowledge of the theory of the case, did not call upon the court to present to the jury the specific rule of law which they desired to have brought to the attention of the jury. Had this been done, and the court given opportunity to so charge, and had failed to do so, this would have been error.

In *State* v. *Schaeffer,* 96 Ohio St., 215, 240, 117 N. E., 220, 227, L. R. A., 1918B, 945, Ann. Cas., 1918E, 1137, where objection was being raised by counsel for the defendant to the failure of the court to charge the meaning of "reasonable doubt" in a murder case, the court says:

"But, had such a charge been fairly required by the evidence in the case, there was still no error, because there was no request so to charge. Counsel cannot sit by and note that the court has inadvertently omitted something in the charge that ought to be given, and not advise the court of such omission, and then thereafter predicate error on such omission. Hence the rule of law is well established that, before such omission can be used as the basis of a proceeding in error, the court's attention should be challenged thereto."

And to like effect are *Patterson* v. *State*, 96 Ohio St., 90, 117 N. E., 169, L. R. A., 1918A, 583; *State* v. *McCoy*, 88 Ohio St., 447, 103 N. E., 136; and *Rucker* v. *State*, 119 Ohio St., 189, 162 N. E., 802.

On the claim that the court erred in refusing to instruct the jury that the first confession admitted on rebuttal was received for the purpose only of impeaching the testimony of defendant, we find no error. This confession was admissible for other purposes. It was proper as testing the claim of the defendant that he was laboring under great mental stress and subjected to undue influence at the time of, and prior to, the signing of the confession, because of the evenness and quality of his signature, to which the attention of the jury was drawn. It probably was admissible for other reasons. However, it was subject to the same test as to its admissibility as the confession introduced by the state in chief, and this situation was recognized by the court in its charge.

The defendant claims to have been greatly aggrieved by the admission of the confessions, and insists that they were obviously secured by improper and undue influence. These were questions which were necessarily to be determined by the jury, and it is possible, although we have no way of knowing definitely, that one or both of the confessions were found to have been produced by duress.

The procedure commonly designated as "Third Degree" has no place in the administration of criminal justice. No state of facts, however desperate, no crime, however harrowing and atrocious, justifies those who are charged with enforcing and upholding

the law in digressing in any particular from the obligation of that duty. Nothing justifies cursing and abusing a prisoner, or subjecting him to long periods of physical and mental strain. It is the law as old as our Constitution that a defendant has a right to stand mute when charged with crime, and that he cannot be compelled to be a witness against himself. If this rule of conduct in criminal procedure is to be changed, it must be brought about by amendment to the organic law. The courts have without a single exception insisted upon a fair observance of the Constitution in this regard. We agree with the contention of counsel for defendant that the striking of a prisoner by one who has authority over him, unless he is in actual resistance, is unjustifiable. The defendant has a right to confer privately with his own legal adviser at all reasonable times. *Mills* v. *Thomas, Warden,* unreported, opinion of this court, Franklin county, March 17, 1927, affirmed by the Supreme Court, *Thomas, Warden,* v. *Mills,* 117 Ohio St., 114, 157 N. E., 488, 54 A. L. R., 1220. However, the character of a confession is not determined by a denial or an abuse of defendant's right, but by the effect upon him of such acts. Such effect it was the function of the jury to determine.

Although it is not necessary for us to so hold, we are of opinion that, without the confessions in this case, the record is sufficient to support the verdict of the jury. The defendant took the stand and voluntarily admitted every material statement in his confessions, excepting the act of cutting the throat of Miss Hix, the attempt to puncture the ear-

drum, his knowledge of such acts, and the fact that prior to the inflicting of the wounds with the knife Miss Hix had been moving and moaning, and that thereafter she was quiet. The fact clearly appearing that the defendant had struck Miss Hix four or five times on the head, one blow a very hard one, the finding of her body the morning after the admitted attack, with the evidence of the admitted blows, together with the physical evidence of the severing of the jugular vein and almost complete severing of the carotid artery, justified the conclusion that whoever administered the blows must have likewise cut the throat. The affirmative evidence on the matter establishes the fact that the severing of the jugular vein and carotid artery either produced death or contributed to cause it. It is highly improbable that the blows were the sole cause of death. The testimony of the defendant logically discloses that the first blows which were struck stunned Miss Hix. The evidence of profuse flow of blood from the wound in the throat, the absence of practically all the blood from the body, and the fact that the major wounds on the head were found to be free from blood clots, are convincing that the knife wound was inflicted before the more serious blows on the head. It is evident that the act of cutting the vein and artery in the manner in which they were severed required expert knowledge and ability and precision, all of which were employed in inflicting the wounds, indicating deliberation and premeditation.

A recital of the details of the killing of Theora Hix, as appearing in the testimony, discloses a most vicious and brutal murder, designed and executed by

a cool and calculating individual, and no excuse or justification therefor is to be found in the record.

Upon a fair consideration of the whole case, consisting of 3,125 pages, practically all of which every member of this court has read, we are unanimously of opinion that no error prejudicial to the defendant has intervened in this record. The judgment of the lower court must be affirmed.

*Judgment affirmed.*

KUNKLE, P. J., and ALLREAD, J., concur.