### GRAMMER *v.* STATE

[No. 18, October Term, 1953.]

202

*Decided November 12, 1953.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Joseph Sherbow,* with whom were *Theodore Sherbow* and *Edward F. Shea, Jr.,* on the brief, for the appellant.

*Ambrose T. Hartman, Assistant Attorney General,* and *J. Harold Grady, Assistant State's Attorney for Baltimore City,* with whom were *Edward D. E. Rollins, Attorney General,* and *Anselm Sodaro, State's Attorney,* on the brief, for the appellee.

HAMMOND, J., delivered the opinion of the Court.

George Edward Grammer was tried by a Judge, without a jury, in the Criminal Court of Baltimore City on an indictment charging him with the murder of his wife. He was found guilty, in the first degree. A motion for a new trial, relying substantially on the same grounds which are urged here, was denied by the Supreme Bench of Baltimore City, two of the ten judges who sat dissenting. After the denial of the motion, Grammer was sentenced to hang. From this judgment and sentence he appeals.

The appellant says that at the time he was tried he could not, and in fact did not, obtain a fair trial.

Three reasons are asserted. The first is that by extensive and all enveloping television, newspaper, and radio publicity as to the crime, before and after indictment, fostered and participated in by the prosecuting officials and the police, the State not only stripped him of his presumption of innocence and convicted him of premeditated murder before he entered the courtroom to be tried, but also deprived him of his free election of a trial by jury and his opportunity of a fair hearing before a judge. The second error urged is that his confessions were not voluntary and should not have been admitted in evidence against him. Third, he claims that the evidence before the Court did not warrant a verdict of murder in the first degree.

The State, in the course of the preparation for printing of the joint appendix to be filed here, petitioned this Court to remand the record to the lower court for correction, or to expunge exhibits consisting of newspaper, magazine, television and radio stories of the crime and the case because they had not been in evidence at the trial. We denied the relief prayed and reserved the contentions made by the petition for determination at the time this appeal was decided.

At the start of the trial on October 14, 1952, the traverser, by his trial counsel who was not his counsel on appeal, made a proffer "for the record as evidence in this case" of the issues of all local newspapers containing stories of the case, and a similar proffer as to "all local television and radio stations . . . and as to the September 15, 1952 issue of Life Magazine" to show that publicity had deprived him of his constitutional right of trial by jury. The Court delayed its ruling on the proffers until after arraignment. The appellant then pleaded not guilty and, once again, elected to be tried by the Court without a jury. (At his original arraignment on September 16, he had elected in open court to take a Court trial). After the plea and the election, the Court said, over the State's objection, that the exhibits were in the record but that the election

of the defendant to take a trial by the Court eliminated any reason to take action on them. Since the exhibits were before the lower Court and were ruled to be in the record we will deny the petition of the State that they be expunged.

The nature and facts of the crime made publicity inevitable. Soon after midnight on August 20, 1952, two Baltimore County policemen who had just turned their radio cruise car into Taylor Avenue from Belair Road, saw a Chrysler sedan coming downgrade on Taylor Avenue at high speed. Suddenly it ran off the road to the right and over a lawn, came back onto the road and crossed to the other side, hit a bank, went up over it, hit a tree, turned over on its right side and came to rest against a telephone pole. In the car was Mrs. Grammer, under the dash, bent over so her head was between her knees. Her face and hair were matted with blood. She was apparently then dead; certainly, she was dead on arrival at the hospital. The first stories in the newspapers indicated that the police thought she had been fatally injured when her car went out of control going down hill on Taylor Avenue. Pictures were published of Grammer at the home of his mother-in-law, Mrs. Schmidt, showing him seemingly a very much affected and bereaved husband. Early police suspicions that the death was murder and not accidental had been aroused in part by a stone found wedged under the heel of the accelerator so as to cause it to feed gas to the engine of the car which had an automatic drive. The Chief Medical Examiner of Baltimore, Dr. Russell S. Fisher, found, as he later testified, that death had been caused by craniocerebral injuries including lacerated wounds of the scalp and ear and extensive fracturing of the skull, inflicted by multiple blunt impacts coming from left to right. There was also extensive aspiration and ingestion of blood. The back of the left hand and the left arm were swollen and purplish. Dr. Fisher examined the car and found no object or surface which in his opinion could possi-

bly have produced the injuries suffered by Mrs. Grammer. Further, he said the bruises could not have come from the accident because dead bodies do not bruise. His conclusion, reported in the papers several days after the happening, was that she had been murdered and the automobile accident arranged to conceal the crime. Pictures were then again published showing Mrs. Schmidt acting as Grammer's nurse, giving him sleeping pills and reporting that he was "dazed by murder". Mrs. Schmidt reported that her daughter had once been beaten by an enemy while the husband was in the army. Grammer issued a public appeal for help "so that whoever is responsible for this will not have a chance to harm someone else". Public interest in what the papers called the "near perfect crime" was fanned by stories as to the pebble under the accelerator and comment on the obvious fact that if chance had not caused the car to swerve and overturn on Taylor Avenue, it would have torn across heavily travelled Belair Road—U. S. Route 1—and either struck another vehicle or a stone and concrete wall along the east side of Belair Road. If this had happened the evidence as to the cause of death and the accelerator might well have been obscured by resulting fire or wreckage and the near perfect crime have become the perfect crime.

On Sunday afternoon, August 31, while in custody of the police, Grammer confessed that after a brief quarrel in the parked Chrysler, he had struck his wife with a piece of iron pipe.

About 4:20 P.M. on Sunday, August 31, the only formal statement ever issued by the State's Attorney was given out. It appeared in the newspapers the next day. The statement read: "After an investigation in connection with the death of Dorothy May Grammer, and interrogation of a number of witnesses, including George Edward Grammer, Mr. Grammer will be charged with the killing of his wife. . ." There are no evening newspapers published in Baltimore on

Sunday, but at 10:45 P.M. there was a television broadcast over a station owned by one of the newspapers. Present in the studio, and shown to the television audience, were the State's Attorney of Baltimore City and two Assistant State's Attorneys of Baltimore County, and two Baltimore County policemen. The commentator said to the television audience that: "We are told tonight by Mr. Anselm Sodaro, State's Attorney for Baltimore City, who is here in the studios with us, that Mr. Grammer has been charged with the murder of his wife. . ." In introducing those present, as the camera was focused on them, the commentator said: ". . . we'd like you to meet this team which has been responsible for bringing a conclusion to this case, that is, conclusion before pre-trial. . ." No one spoke, other than the commentators except Mr. Sodaro, who, after pictures had been shown of the Chrysler, the Towson Court House, of Grammer being taken to the scene of the crime, and the scene of the crime, confirmed a statement that this was in Baltimore City about a sixth of a mile from the County line by saying: "That's correct." Several times the announcer warned of prejudgment. Once he said he would not go into details or motives because: ". . . we will not attempt to prejudge."; and again, ". . . we will ask for no comment from these police and prosecuting officials at this time in the best interests of Mr. Grammer so that we will not prejudice his case."

On September 2, it was announced in the paper that Dr. Fisher would explain on television step-by-step the facts which led to his conclusion that Dorothy May Grammer's death was homicide. This was done on one of a series of television broadcasts produced by the University of Maryland on a program entitled "Death and the Law". No transcript of the program is available but a summary, verified as accurate by Dr. Fisher, shows that he had been scheduled to appear on the program, before the Grammer murder occurred, to describe the functions of the office of the Medical Examiner.

It was suggested to him that he use the Grammer case as an illustration of his work. With the prior approval of the State's Attorney, he did so. The appellant's name was not mentioned, although photographs of Mrs. Grammer were used.

Another dereliction by the State complained of by the appellant is that a newspaper photographer was permitted to take a picture of the Chrysler while it was on a police lot with a stone lodged under the accelerator, placed there by the photographer, and this picture was used by Dr. Fisher on his broadcast without a statement that it was staged. Also, it is said, detectives showed photographers where the pipe, the murder weapon, had been found. The final charge is that the State, through the Judge who heard the case assisted the prosecution in withholding the name and true identity of "the other woman" by permitting her to use a fictitious name and give the bail piece in that name, and that the State's Attorney, while refusing to identify her, let it be known to the press that she had a responsible job, was not of the theatrical world, had an excellent family background and was "more than a casual acquaintance" of Grammer.

We think the appellant attributes to the undoubtedly very extensive public knowledge of and interest in the case and its component facts a prejudice which can neither be shown nor fairly and reasonably be assumed to have existed. All of the facts which the public had learned of the case of any probative value for or against Grammer were presented as evidence at the trial. The appellant's counsel, in announcing the election of a Court trial at the first arraignment, spoke of an existing "hysteria" which, he felt, would prevent a fair and impartial jury trial "anywhere in the country". Hysteria is scarcely an accurate description of the apparent public state of mind. The newspaper accounts give no hint of anger, of hatred, or of intense resentment in the community, such as exists when a child or woman is atrociously molested or raped, or there

has been a series of such incidents or there is a racial element which has aroused abiding prejudice or passion in the public. Here the citizens were intrigued by the nearness to perfection in the crime, and the motive in the form of the love affair with the other woman. Compare *Fountain v. State,* 135 Md. 77.

This is not to say that the actions of the officials of the State should be either minimized or condoned. It was a manifest impropriety for the State's Attorneys to appear on the television program. The Medical Examiner should not have used a pending case as an example of the work of his office, and the State's Attorney should not have approved of his so doing. Officials of the State should not announce, or sanction the announcement, that an accused has confessed or that he has made a statement. The term statement includes those which are exculpatory in varying degrees but to the public mind it has come to be an euphemism which does not deceive but connotes an admission of guilt.

We do find that the public knowledge of the facts of the case cannot fairly be laid at the door of the officials of the State up to the time that Grammer was charged. Until then, the facts themselves had been the inspiration of most of the publicity and appellant and his family had contributed much of it. Since the public knew of the manner of the murder and the effort to make it appear an accident, and also knew that the police were questioning the appellant, the bare announcement by the State that he was being formally charged with the murder of his wife would leave upon the community consciousness the impression that he had told the police things that had led them to believe he was guilty, as directly as the newspaper and television stories about a statement. A charge by the State's Attorney or an indictment by the Grand Jury clearly and obviously implies that the police believe the accused to be guilty, and yet the announcement of such a charge or indictment is not only proper but

necessary. *Baltimore Radio Show, Inc. v. State,* 193 Md. 300. *Certiorari* denied 338 U. S. 912, 94 L. Ed. 562.

If the wide public knowledge of the crime and its details had the effect which the appellant claims, he did nothing to so demonstrate, other than have his counsel announce an unsupported conclusion that he could not have a fair and impartial jury trial. This is not enough. It is not to be presumed that an unbiased jury cannot be had. *Baltimore Radio Show, Inc. v. State, supra.* If he had wanted a jury trial he had several avenues open to him. He could have examined prospective jurors on their *voir dire* to ascertain whether twelve citizens were available who would affirm under oath that they would be guided only by the testimony produced at the trial. There is nothing in the record to show that this could not have been done. In *Garlitz v. State,* 71 Md. 293, a talesman, examined upon his *voir dire,* said frankly he had formed an opinion as to the guilt or innocence of the prisoner and accepted as true the newspaper accounts he had read and the rumors he had heard, but that this could be changed and he could give the prisoner a fair trial, governed only by the evidence. He was held a competent juror. Judge Alvey, after commenting on the natural instincts which lead all men to be biased against crime, and particularly crime of an atrocious character, said that this natural bias should not be regarded alone as sufficient cause for the disqualification of a juror. He continued: "The intellectual, as well as the moral impressions, produced by the reading or hearing of reports or statements of facts in regard to the commission of crime are such that intelligent minds cannot resist; indeed, in many cases the mind receives the impressions from such statements intuitively. But these impressions, with intelligent, fair minded men, are always a hypothetical nature, resting upon the supposition of the truth of what they read or heard. The minds of such men always remain open to the correction of former impressions, and remain entirely impartial, with power

to hear and determine upon the real facts of the case, without the least bias in favor of former impressions, whatever they may have been. And therefore, in our present state of society, all that can be required of a juror, to render him competent, is, that he shall be without bias or prejudice for or against the accused, and that his mind is free to hear and impartially consider the evidence, and to render a verdict thereon without regard to any former opinion or impression existing in his mind, formed upon rumor or newspaper reports."

In *Dennis v. United States,* 339 U. S. 162, 70 S. Ct. 519, 94 L. Ed. 734, 742, in discussing whether Government employees could properly sit on District of Columbia juries, where Communists were being tried, because of the loyalty oath required of such employees, the Supreme Court said: "One may not know or altogether understand the imponderables which cause one to think what he thinks, but surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter." And again: "There is no disclosure in this record that these jurors did not bring to bear, as is particularly the custom when personal liberty hinges on the determination, the sense of responsibility and the individual integrity by which men judge men." See also *Holt v. United States,* 218 U. S. 245, 251, 31 S. Ct. 2, 54 L. Ed. 1021, where Mr. Justice Holmes said: "If the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain jury trial under the conditions of the present day."

The appellant could have exercised his absolute right of removal, as an accused in a murder indictment, if he felt that a more remote and rural atmosphere would be more likely to furnish a fair jury and there could have examined the talesmen on their *void dire.* He could have asked for a continuance but rather, when asked on September 16 when he would be prepared for trial, said he would like a delay of but three weeks. This

was granted and the State secured another postponement of a week so there was a month's delay. The appellant sought no further postponement.

Not only did the appellant and his counsel, active and experienced in criminal trials, make no move to avoid a trial at that time by the Court, but they freely and voluntarily elected a trial by Judge Moser. After stating his conclusion that a fair and impartial jury could not be obtained, appellant's counsel said in Court on September 16: "For that reason, I have taken the matter up with my client and have assured him that he is rather fortunate to have your Honor, who I am sure will give him a fair and impartial trial, to hear this case. That is the reason we are asking for a court trial." This election was made again just before the trial on October 14.

There is no possible inference, either on the facts of this case, or under Maryland practice, that this was a reluctant choice, made because of the publicity, rather than a considered and deliberate decision, based on the pending evidence, that a better verdict might be obtained before a judge. It is the customary rather than the exceptional practice, particularly in Baltimore City. *Rose v. State,* 177 Md. 577, 580, 581, dealt with a case where the appellant had first elected to be tried by a jury and then withdrew that election and was tried by the court alone. The appellant complained in this Court that she had been deprived of her Constitutional rights. Chief Judge Carroll Bond pointed out that trials without juries had been allowed since near the founding of the province, if not from the beginning, and that instances of trials without juries appear in some of the records of the Provincial Court and county courts of the 17th Century. He continued: "And so it was during the 18th century, before and after the Revolution. The practice was then usually supposed to have been derived from the old English practice of confession and submission in minor cases, although innocence was nevertheless provable, and acquittals were

obtained." He continues, in speaking of the practice of trial without a jury: "There is hardly an institution in the state more firmly established. To the knowledge of men now living, trials without juries have long been elected in the greater number of criminal cases in the state, and in the criminal courts of Baltimore City, where the number of such cases is naturally greater than in other jurisdictions, more than ninety per cent of all trials have for many years been held without juries.

"Strictly speaking, there is in this no waiver of a requirement of jury trial. It is more accurate to say that an equally normal method is elected. And there is no reason for disapproving it as deprivation of something an accused should have. It is demonstrated that there is a pronounced desire for it. And for persons who fear the effect of any prejudice in the jury box, racial or other prejudice, it is a boon."

The report of the State's Attorney's office of Baltimore City for the year 1951 shows that of 6,188 cases tried, 5,967 were tried by the court without a jury, always at the election of the traverser since the choice is his; of 90 murder-manslaughter trials, 77 were so tried without a jury. For the year 1952, the report of that office shows a total of 5,790 trials, of which 5,695 were tried by the court without a jury. The murder trial figures show a total of 86, with only 4 tried by a jury.

Since the appellant did twice freely elect a non-jury trial without moving any of the alternatives, there is nothing in this aspect of the case for us to consider on the record. Rule 9, Rules of the Court of Appeals, provides: "In no case shall the Court of Appeals decide any point or question which does not plainly appear by the record to have been tried and decided by the court below." The rule applies to criminal as well as civil cases, *Davis v. State,* 189 Md. 269, and often has been applied. See *Swann v. State,* 192 Md. 9; *Larch v. State,* 201 Md. 52, 92 A. 2d 463; and *Hutson v. State,*

202 Md. 333, 96 A. 2d 593. The appellant says that this Court should reverse nevertheless because of the serious prejudice to his fundamental rights. In *Madison v. State,* 200 Md. 1, 87 A. 2d 593, a capital case, Judge Markell said for the Court: "Defendant contends that by the ruling admitting the photograph in evidence and by other action or non-action which involves no ruling at all by the trial court, 'serious error may have been committed' and should be corrected without regard to the rules of law ordinarily governing appeals. . . We are, however, without authority to review errors in trial tactics of defense counsel or to speculate as to possibilities that different tactics might have produced a different result." If we were permitted to speculate, we would find no reason to suppose that different trial tactics would have changed the result, or indeed that twelve unbiased citizens, who had heard of appellant and the case for the first time in the Court room at the trial, would have felt the evidence called for a lesser verdict.

The requirement of due process has not been offended in this case. There was no need, indeed no reason, why the Court below *sua sponte* should have delayed the trial or taken any action, other than to accept, as it did, the normal election of the appellant to be tried by the Court, at a time agreeable to him. The revelations in the press and on the radio as to the confession and prior record of the accused involved in *Baltimore Radio Show, Inc. v. State, supra,* were far more damaging, inflammatory and potentially prejudicial than in this case. It was there decided that neither public knowledge of a confession nor public statements as to matters that might or might not be admitted in evidence against the accused nor disclosure of the nature of the evidence to be relied on need prevent a trial or vitiate a subsequent jury verdict. See also *Downs v. State,* 111 Md. 241, 247, 248; *Wanzer v. State,* 202 Md. 601, 605, 606, 97 A. 2d 914, 916; and *Jones v. State,* 185 Md. 481, where it was held that the actual truth or falsity of alleged

prejudice must be determined as a fact in each case, and (by necessary inference) that: ". . . statements printed in local and state wide newspapers alleging confessions and admissions of guilt . . ." would not, without more, require removal. The Federal cases and those from other States are in accord.

In *Stroble v. California,* 343 U. S. 181, 72 S. Ct. 599, 96 L. Ed. 872, the defendant's claim was that he had been deprived of a fair trial because he had not been protected from public pressure fostered by the District Attorney. At the time of his arrest and at the time of his trial, there was notorious, widespread public excitment, sensationally exploited by newspaper, radio and television, concerning sex crimes against children, and the defendant's crime particularly. The District Attorney gave to the press "play-by-play" bulletins during the course of the defendant's confession and announced that he was guilty. The papers called him a "fiend" and a "werewolf". Newspaper photographers and television cameras were allowed in the court room at the time of trial. The Supreme Court said that: ". . . petitioner has failed to show that the newspaper accounts aroused against him such prejudice in the community as to 'necessarily prevent a fair trial' ". The Court continued: "At the outset, it should be noted that at no point did petitioner move for a change of venue. . . Indeed, at no stage of the proceedings has petitioner offered so much as an affidavit to prove that any juror was in fact prejudiced by the newspaper stories. He asks this Court simply to read those stories and then to declare, over the contrary finding of two state courts, that they necessarily deprive him of due process. That we cannot do, . . . It is also significant that in this case the confession which was one of the most prominent features of the newspaper accounts was made voluntarily and was introduced in evidence at the trial itself." See also *Lisenba v. California,* 314 U. S. 219, 62 S. Ct. 280, 86 L. Ed. 166. The same ruling has been made in lower Federal Courts where

it has not been shown, as a fact, that the jurors have been prejudiced or where it is shown that even though they were familiar with allegedly prejudicial publicity, they have not been influenced by it. *United States v. Rosenberg,* (2d Cir.) 200 F. 2d 666, 668-669, *Certiorari* denied 345 U. S. 965, 73 S. Ct. 949, 97 L. Ed. (Adv.) p. 853; *United States v. Moran,* (2d Cir.) 194 F. 2d 623, 625; *Lias v. United States,* (4th Cir.) 51 F. 2d 215, 217, affirmed *per curiam* 284 U. S. 584, 52 S. Ct. 128, 76 L. Ed. 505; and *Shushan v. United States,* (5th Cir.) 117 F. 2d 110, 116, *Certiorari* denied 313 U. S. 574, 61 S. Ct. 1085, 85 L. Ed. 1531. The State courts have reached a similar result. *Commonwealth v. Simmons,* 361 Pa. 391, 65 A. 2d 353, 356; *State v. Collins,* 2 N. J. 406, 67 A. 2d 158, 160-161; *People v. Marsh,* 403 Ill. 81, 85 N. E. 2d 715, 719; *Commonwealth v. Noxon,* 319 Mass. 495, 66 N. E. 2d 814; (all capital cases); and *Snook v. State,* 34 Ohio App. 60, 170 N. E. 444, which is parallel in many respects with the instant case, and illustrates the weakness in the appellant's abstract contention that it was impossible to secure an impartial jury.

The appellant urges that the case of *Delaney v. United States,* (1st Cir.) 199 F. 2d 107, requires a contrary conclusion. There, open hearings held by a Congressional Committee had made available to the press, over the objection of the defendant that it would prevent a fair trial, a mass of damaging material, much of which did not get in evidence at the trial. The Court held that the refusal of the trial court to grant a motion for a continuance was an abuse of discretion. The case is clearly distinguishable, and indeed, the Court of Appeals for the Second Circuit refused to follow it in the *Rosenberg* case, *supra,* on the ground among others that in *Delaney* there had been a motion for a continuance, while there was none in *Rosenberg.* Further, the *Delaney* case dealt with a federal policy and rule of conduct and, not as did the *Stroble* case, with whether due process has been offended by a State Court conviction.

218

The claim that the trial judge should have disqualified himself because he fixed bail for "the other woman" under a fictitious name, neither merits nor requires extended comment. This was done to avoid more of the very publicity complained of by the appellant, not only with the full knowledge of his counsel but with his complete acquiesence. The real name of the witness was, of course, known to the appellant and was published in one Baltimore newspaper and elsewhere a short time after she had given bail, so the claim that pertinent facts might have been available to the defense if the name had been made public, is refuted. There is no force in the contention that Judge Moser, in deciding the request for the use of the fictitious name learned so much of the case that he could not properly sit thereafter, either as an abstract proposition or under the facts of the case. It is a common occurrence for a judge, in fixing bail, to hear statements which may be damaging to an accused, and indeed, it is difficult for him to exercise sound discretion if he does not. This does not disqualify him. *Lowery v. State*, 202 Md. 314, 96 A. 2d 20.

The record reveals abundant evidence that Judge Moser gave the appellant a scrupulously fair trial.

Turning to the errors alleged to have occurred in the course of the trial itself, we find that the confessions of the appellant were properly received in evidence. The rule as to the reception of confessions has been restated recently in *Glover v. State*, 202 Md. 522, 525, 97 A. 2d 321, 323; and *Linkins v. State*, 202 Md. 212, 222, 96 A. 2d 246, 251. The State must show to the satisfaction of the Court that the confession was a free and voluntary act of the accused and that in obtaining it, there was no force or coercion used and no hope or promise held out as an inducement. If the court is satisfied on these points, and admits the confession, it goes to the tryer of the facts as part of the total effect we call proof. Where there is conflicting testimony as to whether a confession was voluntary, the conflict must be resolved

by the trial court, and its determination is not reviewable on appeal unless there was a manifest abuse of discretion. *Linkins v. State, supra*; *White v. State,* 201 Md. 489, 492-493, 94 A. 2d 447, 449; *Edwards v. State* 194 Md. 387. In almost every serious criminal case, when a confession is offered in evidence, its rejection is sought. The accused is almost always ready to say that his incriminating statement was not obtained voluntarily but by some form of persuasion or coercion. The trial judge, who has the opportunity to see and hear the witnesses on the stand, must then determine where the truth lies. Unless there has been plain error in his decision, we will not disturb his findings. *Peters and Demby v. State,* 187 Md. 7; and *Jones v. State,* 188 Md. 263, 270-271.

We think there was no abuse of discretion or plain error in the decision of the Court below that the confessions were voluntary.

On Saturday, August 30, Grammer voluntarily accompanied two Baltimore County policemen to the office of the State's Attorney of that County in Towson so that he might be questioned. He answered the questions propounded by an Assistant State's Attorney of Baltimore County from about 1:30 P.M. to 5:40 P.M. His answers were substantially the same as he had given the police before in one or two routine interrogations: namely, that he had come to Baltimore from New York (where he was employed and where the family lived) to see his wife and children, who were spending some time with her Mother, Mrs. Schmidt, a resident of Baltimore. He had planned to return to New York on the night of August 19, and Mrs. Grammer drove him to the station in their Chrysler sedan so that he could catch the 11:28 train. He last saw her as she was driving off from the station and heard about the Taylor Avenue accident only when he was called in New York by his brother the next morning. When this questioning ended, the appellant was taken to Police Headquarters in Towson and given dinner, and after that, he was finger-printed,

photographed and booked for investigation. He spent the night in the ladies' detention cell, which was equipped with a toilet and a plywood cot hanging from chains. He was given coffee about nine o'clock. About 9:30 the next morning, Sunday, August 31, he was given sandwiches and coffee. Two hours later he was taken to the office of the State's Attorney of Baltimore County and again questioned, this time by the State's Attorney of Baltimore City, in the presence of two Assistant State's Attorneys of Baltimore County and three police officers of that County. One of the policemen was Sgt. Gordon Holmes who had gone to school with Grammer and had known him since, although their paths had not crossed often. Again, the appellant gave no incriminating answers. About 1:30 P.M. he was asked about the subject matter of his last conversation with his wife. He said he could not recall it. The State's Attorney then asked: "Are you ready to tell us how you killed your wife?" This was the first time he had been directly accused. He answered that he had not killed her but again could not tell of their last conversation. He sat with his head down, apparently in deep thought, for an hour. Finally, he asked to talk to Sgt. Gordon Holmes and Capt. Simmons alone. All of the others left the room and in the course of an hour and a half's conversation, the appellant confessed that he had struck his wife with a piece of pipe, while she was in the parked Chrysler. Later that afternoon, the appellant repeated his confession to Lt. Hettchen of the Baltimore City police before he was taken to the City, it having been determined that the crime had been committed there. About 6:30 that evening, at Detective Headquarters in Baltimore City, Grammer, in the presence of a number of policemen, gave a statement which was taken down in shorthand. It was then transcribed, and while this was being done, the appellant had dinner. He signed the typewritten confession and initialled each page.

The appellant, to show that the confession was not voluntary, testified that Gordon Holmes had said to

him when they were alone in Towson: "You know, Eddie, we won't do anything to hurt you. I want to do everything I can to help you out. If you will go over this thing, give us a statement, I will let you go." He said this remark was made before he gave any statement at all to Holmes. Holmes denied emphatically and specifically, as did all of the witnesses who had any part in his custody, that any promises or inducements were ever made at any time to the appellant. Giving the confession is not attributed by Grammer entirely to Holmes' remarks. He says also that he had not been properly fed, at least he did not so consider, and that he had eaten only a bite, that his cot had been hard and he had been unable to sleep, so that he sums up the motivation for the confession as: ". . . a combination of existing circumstances and the talk I had with Sgt. Holmes. . ." There has been no claim that there was ever physical mistreatment. The trial court had to resolve a direct conflict in the testimony. It resolved it in favor of the State after full consideration of the background, training and achievement of the appellant, and an appraisal of his mental and psychological equipment. The appellant was an executive of a large corporate employer, supervising some forty or fifty subordinates. He had been through high school and had taken subsequent courses. He had been in the Counter Intelligence Service of the United States Army, his duties, in part, being to interrogate people suspected of collaboration during the Japanese occupation of the Philippines to see whether they should be repatriated to this Country. The trial court found the appellant well equipped and well coordinated mentally, even under severe handicap, to a point where it could not accept as a fact, particularly in view of his admission that he did not know whether Holmes would have had a right to let him go, that Holmes would have made such a remark, expecting the appellant to believe it, or that the appellant would have believed it. The court had no difficulty in reaching the specific finding, from all

the evidence, that there were no inducements by promises, threats or compulsion: "except that inner compulsion the police have no control over but which perhaps a person's mental processes or conscience may have something to do with."

It is not claimed that any hope or promise was offered to the appellant by Lt. Hettchen before the confession was repeated to him on that Sunday afternoon before the appellant was taken to Baltimore City.

The claim as to the Baltimore City confession is that appellant was told on several occasions by Lt. Hettchen that he wanted to help him. An examination of the record reveals that the appellant must mean statements of which the following colloquy, found in the confession, is typical: "Q. Do you remember that you said your wife fell over on the seat? I am trying to help you out, but I don't want to put words in your mouth. I want you to be truthful with us. After she fell over, did you put her back in a sitting position? A. I don't remember." Obviously, the language quoted above is not susceptible of any reasonable construction which would make it an inducement, under any interpretation of the cases. The help offered was to aid the witness in his recollection and nothing more, and the admonition to be truthful has been held, of itself, not to constitute an inducement. *Deems v. State,* 127 Md. 624, 630.

The appellant then testified that before he *signed* the statement, Capt. Murphy said, in the words of the witness: ". . . I can't recall his words—but it was to the effect that if I cooperate with them, they would help me out, too." In another place, the witness says that this statement was made by Capt. Murphy in the course of the interrogation. Nowhere is it contended that Capt. Murphy made this statement, whatever its meaning and effect could be, before the confession was begun. Capt. Murphy was asked on re-cross examination: "Didn't you tell him you would cooperate with him? You used that very expression." Murphy replied: "I told him this—that at the time of court if

he made a statement it would be testified to that he had cooperated with us in making a statement. I said that." The court asked when and the witness replied: "After he made the statement." The court then said: "After he signed the statement?" The witness replied: "Yes sir." All witnesses in the case had been sequestered throughout the trial. As soon as Capt. Murphy left the stand, Lt. Hettchen was immediately recalled. The court asked him whether Capt. Murphy had said to Grammer that it would be testified that he had cooperated in making the statement. The Lieutenant answered that he thought that was said but it was after the statement was taken, this was his recollection. Each of the other police officers, including Mrs. Batt, the stenographer, was then recalled. Each testified flatly and explicitly that the sentence in which the word co-operation was used had been said after the confession had been given and signed. One said: "It was very late in the evening after everything was over."

The court found as a fact that the police had at that time, in the person of appellant, a man who was not only ready but almost eager to talk, and that Capt. Murphy, an experienced police officer, would not then have made the remarks attributed to him. The judge concluded: "Factually, I find it was not made in the beginning of the statement. I think Captain Murphy's statement as made on the stand was correct."

There is substantial support for the finding of the trial court that neither the Towson confessions nor the Baltimore City confession were involuntary. The appellant admitted that each time he was questioned, he was told in the beginning that he need not answer and that any answers given must be free and voluntary. He admits that he shook hands with Capt. Simmons of Baltimore County just before he left for Baltimore City, although he denies he said then, what the other witnesses testify that he did say: "Captain, I want to thank you for the way you have treated me and tell your men how they have treated me—like gentlemen."

The appellant said several times, when asked by the Court why he gave the statement in the City, that he didn't know how much faith or trust could be put in what was said by Lt. Hettchen and Capt. Murphy. Most significant is the fact that after signing the confession and initialling each page, the appellant asked and was allowed to make a notation in his own hand writing at the bottom of the statement. He then had an opportunity to write any objection to what had gone on or any claim as to treatment. What he did write was: "I should like to say that my impression of police officers and their actions has been very misleading. All of the gentlemen who talked or questioned me at all times were extremely courteous and helpful in relieving me of this terrible pain. No one threatened me or used force in any way. I sincerely appreciate their treatment and help." The reference to the relief from "this terrible pain" and the use of the words "helpful" and "help" in the context in which they are, lend force to the trial court's finding that no inducement repugnant to the law had brought about the confession but rather that "inner psychological pressure of conscience, 'penitence and remorse' . . . to tell the truth . . .", which does not constitute coercion in the legal sense, but rather, if unaided by external stimuli gives weight to a confession. *James v. State,* 193 Md. 31.

No violation of rights under the due process clause can fairly be claimed in the circumstances of the confession. There are no undisputed facts and no facts substantially unchallenged which permit a rational inference that appellant at the times he confessed was not in possession of full mental freedom either to confess or deny. *Lyons v. Oklahoma,* 322 U. S. 596, 64 S. Ct. 1208, 88 L. Ed. 1481; *Malinski v. New York,* 324 U. S. 401, 65 S. Ct. 781, 89 L. Ed. 1029; *Stein v. New York,* 346 U. S. 156, 73 S. Ct. 1077, 97 L. Ed. (Advance p. 1007) ; Cf. *Haley v. Ohio,* 332 U. S. 596, 68 S. Ct. 302, 92 L. Ed. 224. The evidence as a whole is persuasive that he did have such freedom. Neither the length of de-

tention, the periods of questioning nor the circumstances attending both, were as severe as those in other cases in which confessions have been held admissible. *White v. State,* 201 Md. 489, 94 A. 2d 447; *James v. State,* 193 Md. 31; *Grear v. State,* 194 Md. 335; *Brown v. Allen,* 344 U. S. 443, 97 L. Ed. (Advance, p. 375 at 397) ; *Gallegos v. Nebraska,* 342 U. S. 55, 72 S. Ct. 141, 96 L. Ed. 86; and *United States v. Carignan,* 342 U. S. 36, 72 S. Ct. 97, 96 L. Ed. 48.

The appellant does not claim that he did not kill his wife. He claims that there was no evidence of premeditation which would support the verdict of first degree murder and that properly he can be found guilty only of second degree murder or manslaughter. Our task is only to decide whether the trial judge could fairly be convinced beyond a reasonable doubt of the guilt and the degree of guilt of the accused. *Berry v. State,* 202 Md. 62, 96 A. 2d 319; *Estep v. State,* 199 Md. 308, 86 A. 2d 470; and *Chisley v. State,* 202 Md. 87, 95 A. 2d 577. We think that there was evidence to justify the finding of premeditation. In one of his confessions, Grammer says, in referring to his wife's statement that he though more of his job than he did of her: "I thought of it for a while, stopped the car and got out. I guess I was just going to leave. I did not know exactly. I saw a piece of pipe and remember hitting her with it once." There was opportunity for reflection and decision, whether to kill or not to kill, in the length of time needed to get out of the car, pick up the piece of pipe, return to the car, and strike the fatal blows. The individual who did these things was sufficiently possessed of his faculties and reasoning to start the car and insure that it would continue in motion down Taylor Avenue by the use of the stone under the accelerator. Grammer admitted he might have put it there, and there was evidence given by a nearby neighbor that the automobile started some two minutes after a terrific scream given by a woman. There

followed the trip to New York and the delivery of the important papers which would be remembered—all this amounts to enough to justify a finding of premeditation. *Chisley v. State, supra.*

In addition, there was other evidence which indicated premeditation to the Court below. This was that Grammer was in love with Miss Mizibrocki and she with him. His letters to her, her letters to him, her statements on the witness stand, and other facts, including their stay together as man and wife in Chicago shortly before the crime, could show, as the trial court found that it did: ". . . that the relationship between the two had slowly but irrevocably come to the point of decision from which there could be no possible return." Marriage was evidently discussed between them and contemplated by them. Miss Mizibrocki, because of her religious faith, had indicated before and reiterated from the stand, that she would never have married him except in her faith. Even believing that he was free to marry, as she did, she was insistent upon his changing his religion before their marriage. In view of this religious barrier, the Court below found that a divorce would not have given him his freedom to marry, so there arose, in its opinion, the necessity in the mind and heart of the appellant which brought about the planned killing. The trial court said: ". . . There are in this case many, many other surrounding facts and circumstances which point beyond any doubt that the defendant, George Edward Grammer, intended to kill his wife because that was the one way that he could continue the life he had chosen to live and that he deliberately, with premeditation and with malice, carried out that intent."

We cannot say that the court was not justified in arriving at the verdict it did on the facts before it.

*Judgment affirmed.*