## LAMBERT ET AL. *v.* STATE

[No. 207, October Term, 1949.]

58

*Decided July 19, 1950.*

*Motion for rehearing, filed August 18, 1950, denied October 5, 1950.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON and HENDERSON, JJ.

*Jerome Robinson* and *John Grason Turnbull,* with whom was *John W. Farrell* on the brief, for appellants.

*Kenneth C. Proctor, Assistant Attorney General,* with whom were *Hall Hammond, Attorney General, Francis T. Peach, State's Attorney for Baltimore County* and *Johnson Bowie, Assistant State's Attorney* on the brief, for appellee.

MARBURY, C. J., delivered the opinion of the Court.

The appellants were tried jointly before the court, sitting without a jury, in the Circuit Court for Baltimore County, on two informations charging violation of the gambling laws. These informations were filed subsequent to the issuance of a search warrant and a search under its authorization. On January 20, 1950, all defendants were found guilty of violating the third, fourth and thirteenth counts of both informations. The two informations were alike, except that one charged its violations as occurring on October 25, 1949, and the other on October 26, 1949. Each defendant was sentenced to one year and a thousand dollar fine on each information, to run consecutively. From the judgments and sentences against them, they appealed here.

The main questions raised are the validity of the search warrant and the admissibility of the evidence obtained under it. The search warrant was attacked by motions to quash on three grounds. A. That the statute authorizing its issuance, Chapter 749 of the Acts of 1939, codified as Article 27, Sections 306 and 307 of the Code, was never constitutionally passed by the Legislature. B. That Chapter 749 of the Acts of 1939 is invalid because its title is defective, and C. That the affidavit filed with the Court, upon which the search warrant was issued, failed to show probable cause of the commission of the crime charged. The State contends

that the appellants cannot raise these kindred questions involving the search warrant and the admission of the evidence procured thereby, because they are not shown by the evidence to have had any connection with the premises searched, other than their presence there. The appellants, in opposition, rely upon the words "lawful occupants" or "lawful occupancy" found in our decisions defining those who have a right to object. *Baum v. State,* 163 Md. 153, 155, 161 A. 244; *Kapler v. State,* 194 Md. 580, 71 A. 2d 860. They say the State did not raise this question below, and that it must be presumed, in the absence of evidence to the contrary, that they were legitimately on the premises, and were, therefore, lawful occupants, and, as such, entitled to move to suppress the evidence and to object to its introduction.

The trial court ruled adversely to appellants on the issues raised by them, although the record does not show that it passed directly on the right of the appellants to raise them. Such right is personal, cannot be exercised by any defendant, and its existence is a matter which must be determined by the court before consideration of the other points involved. The question of such right was obviously primarily involved in the motions and objections, and the trial court, by passing on the grounds urged by appellants, impliedly held that they had the right to make these motions and objections. We think the decision of that question in favor of the appellants was implicit in the rulings of the trial court, and that it is properly before us.

In the course of the remarks of the trial judge announcing his verdicts and sentences, he asked the State's Attorney whether appellants came from Baltimore City. The State's Attorney said "Alder, I believe was occupying those premises in an upstairs room there under some nebulous agreement. I just don't know what it was. We had the owner in, as a matter of fact under oath. I couldn't come to any satisfactory decision in my mind." This statement is not only, in terms, no concession by the State of any right of Alder to be on the premises,

but it was made after the trial, and could have had no effect on the rulings made. Nor does the fact that the 5th count of the informations charged that appellants rented the premises for gambling purposes help the appellants. The State offered no evidence to support this allegation, and the appellants were not convicted on this count. We must determine from the facts produced in the trial, what was the status of the appellants with respect to their occupancy of the property.

We re-examine and re-state, briefly, the constitutional and statutory provisions involved, their origin and their previous construction. The 4th Amendment to the Federal Constitution is not involved, since it does not apply to State action. *Palko v. State of Connecticut*, 302 U. S. 319, 58 S. Ct. 149, 82 L. Ed. 288; *Adamson v. People of State of California*, 332 U. S. 46, 67 S. Ct. 1672, 91 L. Ed. 1903, 171 A. L. R. 1223; *Wolf v. People of State of Colorado*, 338 U. S. 25, 69 S. Ct. 1359, 93 L. Ed. 1782. The 14th Amendment, however, includes within its protection those immunities in the first eight amendments which may be found to be "implicit in the concept of ordered liberty." Justice Cardozo in *Palko v. State of Connecticut, supra* [302 U. S. 319, 58 S. Ct. 152]. Immunity from illegal search was one of the early freedoms claimed by the colonists and provisions with respect to it were inserted in the first Maryland Constitution. These provisions are found today in Article 26 of our Declaration of Rights. The Supreme Court has held that in a prosecution in a state court for a state crime the 14th Amendment does not forbid the admission of evidence obtained by an unreasonable search and seizure. *Wolf v. People of State of Colorado, supra.* We, therefore, consider the subject of an unlawful search, and the admission of evidence thereby obtained solely from the standpoint of our own Constitution and our own statutes and their historical origins, although the decisions of the Supreme Court on the kindred 4th Amendment are entitled to great respect.

General warrants of search were used in England and in the Colonies to find evidence of political crimes or evidence which might be used to convict political opponents. *Entick v. Carrington,* 19 How. St. Trials 1029; Otis' argument, *Works of John Adams,* Vol. 2, page 523. We have recently discussed this somewhat at length. *Bass v. State,* 182 Md. 496, 35 A. 2d 155; *Asner v. State,* 193 Md. 68, 65 A. 2d 881. The prohibitions in the 4th Amendment, *Boyd v. United States,* 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746, and in the State Constitutions were directed primarily against these practices. *United States v. Kirschenblatt,* 2 Cir., 16 F. 2d 202, 51 A. L. R. 416, Judge Learned Hand. The people intended to be protected were those whose houses or possessions were to be searched, and not those who had no interest in or connection with such houses or possessions. In considering the question before us, this is the important fact to be borne in mind.

In Maryland it was formerly held that the question whether evidence was admissible in a prosecution depended on the nature of the evidence, and whether it was pertinent, and not on how it was procured. *Lawrence v. State,* 103 Md. 17, 63 A. 96; *Meisinger v. State,* 155 Md. 195, 141 A. 536, 142 A. 190. This is still the rule as to felonies, *Marshall v. State,* 182 Md. 379, 35 A. 2d 115, but the Legislature changed it with respect to misdemeanors only, by the passage of the Act of 1929, Ch. 194, Code Article 35, Sec. 5. Then, in order to permit the lawful obtention of evidence to be used in the trial of misdemeanors, the Act of 1939, Ch. 749, was passed. This act has been before this Court in many cases, and we have, in a number of them, held that only certain people had a right to object to evidence obtained under its provisions. The description of such people in these decisions has followed the pattern laid down by Judge Digges in *Baum v. State,* 163 Md. 153, 161 A. 244, 245. He said, "* * * one cannot complain of an illegal search and seizure of premises or property which he neither *owns,* nor *leases,* nor *controls,* nor *lawfully occupies,* nor *right-*

*fully possesses,* or in which he has no *interest"*. (Emphasis supplied here.) Only recently we cited the cases which followed that formula, and re-affirmed it as a positive statement of those who could complain. *Kapler v. State,* 194 Md. 580, 71 A. 2d 860.

In all of these cases the words "lawfully occupies" are intended to be of the same nature and kind as the others used, and contemplate an occupation of some character which is connected with the property or the premises by some lawful means. They have not been used to include those who are merely invitees, or whose presence is only "lawful" because they are not trespassers. The occupancy must have some relation to the property or premises searched in order to enable such "occupants" to claim that their possessions have been unlawfully seized. It is not sufficient that they are merely there when the search is made. They must be there with some show of right to be in possession of the premises or property.

Not only is this clear on rational and historical grounds, but it appears from the cases themselves. In the *Baum* case, *supra,* the first case in which the point was decided, the defendants, who were not allowed to object to the evidence produced by the search, were found on the premises playing a game of cards. From this fact, it could not be said they were not there lawfully but on the other hand it could not be said that their presence showed they had any special rights in the property. In *Frankel v. State,* 178 Md. 553, 16 A. 2d 93, the police were searching No. 110 Jackson Place, and finding that some of the men found there had run through a fake partition into No. 112 Jackson Place, the police searched the latter building also. The defendants objected to the evidence found in 112, because the search warrant included only 110. The court refused to allow the objection, among other reasons, because there was nothing to show that those objecting were lawful occupants of 112. In *Resnick v. State,* 183 Md. 15, 36 A. 2d 347, the defendants were not permitted to object because the

only claim made as to their rights on the premises was that they had been making books there for a year (an unlawful occupancy) which, of itself, did not show they had any right to be there.

The facts in the case before us have much similarity to those in the *Baum* case, *supra*. On October 6, 1949, the officers watched the residence premises, 5912 Liberty Road and saw Victor Lambert, one of the appellants, go there between one and two o'clock, driving an automobile licensed in his name. He was there until the officers left, which was approximately an hour afterwards. The following Saturday, the officers saw the same thing happen, and on the week before the 26th they saw Lambert visit the property every week day. Lambert, they said, usually went in after 11:30. He was sometimes by himself, sometimes with another man, but the other man was not identified by the officers. 5912 is a two story, frame dwelling, sitting back from the road about 25 feet. The officers visited the property on two Sundays in October, but nobody came there then. The explanation offered for this is that no races run on Sundays. Telephone Mohawk 3771 was listed at 5912 Liberty Road as a nonpublished telephone in the name of William W. Boone. Telephone Forest 0326, also listed at 5912 Liberty Road, was listed in the name of Miss Mildred M. Mullen. Telephone Mohawk 2263 is listed at 5908 Liberty Heights Avenue in the name of James Hughlett. On October 25th, the officers called Forest 0326 from the State's Attorney's office, but kept getting a busy signal. They then called Mohawk 3771, and when there was an answer they asked for Froggy. Some one came to the phone and said he was Froggy, and the officer said "This is Lawrence." Froggy said "Where did you get this number from?" He was then told the other line was busy, and he said "I don't take any bets on this telephone". The officer then said he would call the other number. He called Mohawk 2263 listed to 5908, but which had connections not made by the telephone company, found in the basement of 5912

when the search was made. When he called this number, the same man's voice answered, and said he was Froggy, and the officer said "This is Lawrence again. Put me $5.00 to win on Blue Hill." Froggy said "This isn't Lawrence. It doesn't sound like him." The officer said "Yes it is." Froggy said "Go to hell with the bet." The officers got the search warrant on the 26th and went to the premises about 3:20 in the afternoon. They went to the back door and knocked. There was no answer. They broke the glass and went in to the first floor. There was no one on the first floor, but the cellar door was locked by a reinforced door. The officers knocked and banged on this door and tried to break it in. After finding no one on the second floor, and not being able to break down the cellar door, they went outside to the basement door in the rear. They broke that door in, and while they were doing it, noticed small pieces of paper coming out of the chimney. Finally, after breaking the basement door, they were admitted. The testimony shows that both the doors to the basement were very heavily reinforced. The basement was a refinished cellar. In one of the rooms was a card table and several chairs, and the appellants were sitting around the table playing cards. An oil burner was burning. The officers shut that off, and eventually got charred paper out of it which was sent to the Federal Bureau of Investigation. They found it contained the names of horses and race tracks, and other notations, indicating bets had been recorded on these horses at these tracks. All around a table in the cellar were telephone plugs which were connected with the telephone at 5908. There were also the listed two telephones, but they were concealed between the ply-board and the stone wall. The officers also found an adding machine, about two dozen pencils and some pads and other articles. There is nothing in the evidence, other than the above, to show what the appellants were doing there, except that one of the officers said that Carr said he had come out to the residence to pay the occupant a visit.

From these facts we can deduce no lawful right of the appellants to be on the premises other than their mere presence. They were playing cards, just as the defendants in the Baum case were playing cards when they were found, but, as in that case, this was an obvious subterfuge. If they were engaged in book-making activities, their occupancy was illegal, and such unlawful presence, as was held in the *Resnick* case, *supra,* does not give them the status of lawful occupants. Under these circumstances we are unable to find that they had any special right in the premises, and, therefore, they had no standing to raise the three questions they do about the search statute and the search warrant. These questions, therefore, are not properly before us, and cannot be considered on this record.

Appellants have another contention that one of the officers was permitted to testify as to the notations on a pad which was found at the time of the raid. This pad did not show any notations when it was found, but when it was sprinkled with finger print powder some came out, and the officer made notes what they were. The notations on the pad subsequently faded, and were not visible at the time of the trial. Objections were made that the officer's testimony from his notes was not the best evidence, and that it is not connected with the defendants. We think neither of these objections is tenable. It is difficult to say what could be the best evidence of the invisible notes, if a copy of them transcribed when they were made temporarily visible by finger print powder would not be admissible. Certainly the pad itself now shows no notes, and the question of whether the copy is correct is a matter of credibility and not of admissibility. We think, also, it is properly connected with the defendants, because it was found with the other paraphernalia in the room.

Appellants also ask us to review the verdicts of guilty because the evidence is insufficient to support them. This request is made under Part 4 of our General Rules of Practice and Procedure with respect to Criminal cases,

Rule 7(c), which reads as follows: "When a criminal charge has been so tried by the Court, an appeal may be taken as provided by law. Upon appeal the Court of Appeals may review upon both the law and the evidence to determine whether in law the evidence is sufficient to sustain the conviction, but the verdict of the trial court shall not be set aside on the evidence, unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

This is the first occasion which we have had to apply this rule, and we call attention especially to the provision that the verdict of the trial court shall not be set aside on the evidence unless clearly erroneous. That rule was adopted for the purpose of preventing a possible miscarriage of justice by permitting the determination of one judge to take away the life or liberty of an accused without a review by any other tribunal. It was not intended, and will not be construed, to permit us to reverse judgments merely because our conclusion on the record is different from that of the trial judge. It is only intended to prevent manifest error.

We have already outlined the testimony in this case, which shows that one of the appellants, Lambert, was seen to go constantly to this residence, which, so far as the record shows, was not used as such by any one. His visits there were at times when, from long experience, it has been found that bookmaking activities are conducted. When the officers practically broke in the premises, after some time during which those inside were protected by the barricades, the four appellants were sitting around a table playing cards. They were in a basement and they had an oil burner going which it was testified made the place very hot. From this burner were taken charred pieces of paper which showed notations of bets on races. The obvious purpose of the fire was to destroy the evidence. There were not only two telephones in the basement which were listed under different names, but there was a connection with a tele-

phone listed to a nearby house with a number of plugs so that ear-phones could be plugged in on this telephone. The telephones listed at the house were concealed. The place was barricaded, and it seems to us, beyond any reasonable doubt, that the appellants were there for the purpose of running a gambling establishment and of taking bets on races, and that these bets were noted on paper. We cannot find any error in the verdict of the court that all of the appellants were guilty, on October 26th, of the offienses charged in the three counts before us.

With respect to the information which charges the same offenses on October 25th, there does not appear in the record anything whatever to connect the appellants, Carr, Salfner and Alder with the premises on that date. They were not seen to go there, they were not found there, and there is no evidence that they were ever there before the 26th. This paucity of necessary facts, which was admitted by the Assistant Attorney General at the argument in this Court, impels us to reach the conclusion that there was not sufficient evidence to find these three appellants guilty on the 25th of any of the offenses charged. The judgments of the lower court, finding them guilty on that date, will have to be reversed. As to the appellant, Lambert, the situation is slightly different. He had been seen visiting the premises every day for a week prior to the 25th. While the record does not show that he was seen going in there on that day, nevertheless, the officer who talked to some one there on the telephone on the 25th, said that he talked to Lambert. He said that the man he talked to identified himself by saying that he was "Froggy". His testimony does not state directly that Lambert's nickname is "Froggy", but that is a necessary conclusion from the officer's statement that he talked to Lambert there. It is true, "Froggy" did not take a bet, but it appears quite clear from the testimony, that the reason he did not was because he was suspicious, and that he was there to take bets if his suspicions had not been

aroused. Putting together the previous visits, Lambert's presence on the 25th, his statement over the telephone, and his being found there on the 26th, under the circumstances already related, we are unable to say that there is not sufficient evidence to find him guilty on the 25th, and, therefore, the judgment as to him will be affirmed.

Judgments as to all appellants in No. 12949 in the Circuit Court for Baltimore County, charging offenses on October 26, 1949, affirmed, with costs. Judgment as to Victor Lambert in Case No. 12954, in the Circuit Court for Baltimore County, charging offenses on October 25, 1949, affirmed, with costs. Judgments as to John M. Carr, John R. Salfner and Leonard S. Alder, in Case No. 12954, in Circuit Court for Baltimore County, charging offenses on October 25, 1949, *reversed without new trials.*