## ESTEP *v.* STATE

[No. 97, October Term, 1951.]

*Decided February 8, 1952.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*Malcolm J. Coan,* with whom was *Howard C. Bregel,* on the brief, for appellant.

*A. T. Hartman,* Assistant Attorney General, with whom were, *Hall Hammond,* Attorney General, and *John E. Raine, Jr.,* State's Attorney for Baltimore County, on the brief, for appellee.

MARBURY, C. J., delivered the opinion of the Court.

Appellant, a physician, was indicted by the grand jury of Baltimore County under Code, Article 27, Sec. 3, was convicted under the fourth count of such indictment by the trial judge, sitting without a jury, and was sentenced to be confined in the Maryland House of Correction for a term of six months, and to pay a fine of $1,000.00. He appeals on the ground that the evidence was insufficient to show that he was guilty, and that therefore the decision of the trial judge was clearly erroneous.

The fourth count on which he was found guilty is as follows: "And the Jurors aforesaid upon their oath aforesaid do further present that the said Paul R. Estep on the said day in the said year at the county aforesaid unlawfully and wilfully did administer to one Jean Amend, she the said Jean Amend being then and there a woman pregnant with child a certain drug and substance the name and components of said drug and substance being to the Jurors aforesaid unknown with in-

tent thereby then and there to procure the miscarriage of her the said Jean Amend * * *". This count, as will be seen, charges him with administering a drug to a pregnant woman with intent to procure her miscarriage.

Our Rule 7(c) of the Criminal Rules of Practice and Procedure has been before this court a number of times recently, and we have held that it was not intented and will not be construed to permit us to reverse judgments merely because our conclusion on the record is different from that of the trial judge. We must find that his conclusion was clearly erroneous. In the first case, however, in which we discussed this rule, *Lambert v. State*, 196 Md. 57, 75 A. 2d 327, we found that three of the appellants were charged with violation of the gambling laws at a certain premises on two dates, October 25 and October 26. We found from the evidence that there was no error in the verdict of guilty under the information which charged the offense on October 26, but we held that there did not appear in the record anything to connect three of the appellants with the premises on October 25, and, therefore, as to them we reversed the judgments based on verdicts of guilty of the offense charged on that date. We discussed the general scope of our rule in an opinion filed on a motion for re-argument in the case of *Edwards v. State*, 198 Md. 152, 83 A. 2d 578. In that opinion we said (p. 157) : "In any case, civil or criminal, to meet the test of legal sufficiency, evidence (if believed) must either show directly, or support a rational inference of, the fact to be proved. * * * In a criminal case the fact must be shown, or the inference supported, beyond a reasonable doubt or to a moral certainty, or reasonable doubt of an opposite fact must be created. The difference in degree of proof is ordinarily for the triers of facts." We are, therefore, not to say whether we find beyond a reasonable doubt that a traverser is guilty of a crime with which he is charged. What we are to find is whether there was evidence, or inferences from evidence, upon which the trial judge could find the traverser guilty. If the record shows such evi-

dence or proper inferences, we cannot find that the decision of the trial judge is clearly erroneous, but if it contains no such evidence or inferences, then we must find his decision erroneous. This is illustrated by the *Lambert* case, *supra,* in which we found that there was no evidence that three of the traversers had been at a certain place on a certain day, and that therefore the decision of the trial judge was clearly erroneous as to an offense committed at that place on that day, however strong might have been the suspicion from their being there the day after, that they did have something to do with the place on that day.

In the case before us, the evidence centers around the intent with which the appellant administered a drug to the prosecuting witness. She was a married woman who had a paramour, and, in the course of time, the inevitable consequences resulted. She attempted to do something to avoid them. She says what she did was to take three drops of turpentine. In any event, although her purpose was not accomplished, some physical trouble resulted and she and her companion in the illicit affair sought the services of the appellant, a physician of about ten years practice. He said the first thing to be found out was whether the woman was pregnant. She went to see another doctor, but got no satisfaction from him, and then finally she and her companion came to see the appellant. He had previously informed them that his fee would be $200.00, but later reduced this to $150.00, and was paid this amount. We may not unreasonably suppose that this sum of money was intended by those who paid it to be the compensation for the performance of an abortion. It is true there was some circumstance which may have justified them in being fearful of the physical consequences to the woman of what had been done before by her, but their main purpose undoubtedly was to get rid of the impending child. What the appellant did when they came to his office was to examine the woman and then to give her an injection or "shot" in the arm. This is all the testi-

mony as to his actions. There is nothing to show what was given through this injection, or that it was anything which could produce the result which the patient wanted. In fact, the only testimony from any other physician points to an opposite conclusion.

After the injection was made, appellant told the woman to return home, that she would start suffering pains in about twelve hours, not to be alarmed by them, and, if they were too hard to bear, to take some whiskey. She did start to suffer pains in about twelve hours, and finally went to a hospital, where a physician there found it necessary to express the contents of her womb in order to stop the bleeding. The appellant testified that what he injected into her arm was penicillin in order to prevent infection, but it is not necessary to believe his testimony in this respect. He said that he thought she was going to miscarry in about ten or twelve hours. He also testified that $150.00 was not his fee, but that the man offered him $150.00 to take care of the woman if she had any trouble, and that was why he took it. In this respect also it is not necessary for us to believe his testimony.

Nevertheless, in order to find him guilty of giving the woman a drug with intention to produce miscarriage, there must be, if not evidence what the drug was, at least some evidence that there is such a drug which would or which he thought would produce such a result if administered in this way. On this point, we have only the testimony of the other physician, and, in order that there may be no question about it, we quote it in full:

"Q. Doctor, would it have been possible for her condition to have been produced by the administration of any one dose of drug?

"(Mr. Turnbull) Objection.

"(The Court) I'll let him answer that, if he is able.

"A. Beg your pardon?

"Q. (The Court) You can answer that. A. To my knowledge, no.

"Q. (The Court) You mean, in your opinion. A. In my opinion. Excuse me. You are assuming that she had a normal pregnancy and nothing was wrong with it, and to administer a drug to produce—

"Q. (The Court) One dose, the question was. A. No, in my opinion.

"Q. (The Court) She was then having a miscarriage? A. Yes.

"Q. (The Court) It had not been completed. A. I just completed it, sir.

"Q. (The Court) You describe it as inconplete? A. Right, yes, sir.

"Q. (The Court) Which meant it was in the process? A. It was in process, and I just went ahead to complete it."

It is contended on behalf of the State that the doctor meant by this testimony a situation where there was a normal pregnancy, and nothing was wrong with it, but we cannot so read it. The question was whether her condition could have been produced by the administration of any one dose of a drug, and the answer was unhesitatingly "No", and the court, to make it clear, asked if she was then having a miscarriage, and the answer was "Yes". Under these circumstances, we can read the doctor's testimony in no other way than that he was talking about this particular woman in the particular situation in which she was, and his testimony is that no one drug administered in the way it was administered could have produced a miscarriage.

There is also evidence that there was found in the doctor's office two bottles of a drug called "Ergatora", one of which was empty and one bottle had had perhaps ten or twenty tablets in it. The trial judge in his opinion did not discuss this question, and we do not know whether it influenced in any way his opinion. There is nothing in the evidence to show what this drug is used for. Appellant's counsel in his oral argument stated that an examination of the medical authorities

would show that it was used not only for parturition but for a great variety of other purposes. None of that is evidence. The mere fact that it was found in appellant's office would not in any way justify an assumption that it was used in this case. In the case of *Wilson v. State,* 181 Md. 1, 5, 26 A. 2d 770, 773, we said: "It is improper, of course, to admit a drug in evidence merely on the testimony of an expert that it is possible to use the drug for the purpose of performing an abortion, without any showing of some connection of the drug with the perpetrator or the victim of the crime." In the case before us, we have not even this much evidence.

In order to find the appellant guilty in this case, it must be found that the injection in the arm of the woman was given by appellant with the intent to produce a miscarriage. If there is no drug which, so injected, would produce that result, as the evidence seems to show, then there must be at least evidence that the accused thought there was some such drug and was using it. Such evidence is wholly lacking. No matter how sordid the case and how suspicious the circumstances, we cannot permit a person charged with crime to be convicted without evidence. The conjectures of the trial judge might be entirely correct, and the evidence produced before him might be false in important particulars. Nevertheless, a conviction without proof cannot be sustained under the laws of this State. A man is innocent until he is proved guilty, and there must be evidence which leads to such a result. Since we find there was no such evidence in this case, the judgment must be reversed.

Since, however, the sole reason for reversal is the insufficiency of evidence, and this may be supplied by the State, we think the appellant should not now be allowed to go free without giving an opportunity for its production. We will therefore remand the case for a new trial. *Wright v. State,* 198 Md. 163, 81 A. 2d 602.

*Judgment reversed and case remanded
for a new trial.*

MARKELL, J., filed the following dissenting opinion, in which HENDERSON, J., concurred.

In order to find defendant not guilty of the crime with which he was charged and of which there is abundant evidence, it is necessary in effect to find him guilty of a fraud with which he was not charged and of which there is no evidence other than his own testimony that the drug he administered was penicillin and that in his opinion (with which he says some physicians differ) penicillin would not have any effect on a [threatened] miscarriage other than to safeguard from infection. Defendant's testimony alone, in this respect in full accord with the testimony of both of his customers, conclusively shows what the customers came for, what he demanded $200 for (and later accepted $150)—cash in advance—and what result he told them to expect. These are undisputed facts—though, as the majority opinion indicates, we need not believe that the drug defendant administered was penicillin or that the only instrumentality previously tried by the woman herself was a few drops of turpentine. Defendant's testimony not only directly proves all the facts already mentioned, but shows his entire bad faith (so far as violating the law is concerned), and his "good faith" in giving the unlawful service for which he was employed and paid, and warrants an inference of the intent on his part which was the customers' sole purpose in coming to him. The view of the majority opinion seems to be that the required intent is lacking because (1) there is in fact, and (2) defendant knew there is, no known drug which would produce the effect bargained for. Neither of these premises is supported by evidence.

Whatever ambiguity there may have been in Dr. Ehrlich's answer was immediately corrected by him. Defendant was not dealing with a "normal pregnancy" but with one that already had been tampered with. Dr. Ehrlich did not say—and defendant did not say—that no single dose of any known drug, administered to a woman in the condition in which she was when de-

fendant treated her, could have produced "her condition" at the time Dr. Ehrlich saw her.

Judge Henderson authorizes me to say that he concurs in this opinion.