# FAULCON *v.* STATE

[No. 21, October Term, 1956.]

*Decided November 13, 1956.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON and HAMMOND, JJ., and HENDERSON, J., Chief Judge of the Fourth Judicial Circuit, specially assigned.

*Anthony S. Federico* and *Malcolm J. Coan* for the appellant.

*Stedman Prescott, Jr., Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General, David Kauffman, Assistant Attorney General, Anselm Sodaro, State's Attorney for Baltimore City, Saul A. Harris* and *James O'C. Gentry, Assistant State's Attorneys,* on the brief, for the appellee.

COLLINS, J., delivered the opinion of the Court.

The appellant, James W. Faulcon, was indicted for murder in the first degree of Walter W. Lockett. He pleaded not guilty. He was tried before the trial judge, sitting without a jury, and found guilty of murder in the first degree. After a motion for a new trial was denied by the Supreme Bench of Baltimore City, he was sentenced to life imprisonment in the Maryland Penitentiary. From that judgment and sentence he appeals here.

The appellant does not dispute that he killed Lockett on October 14, 1955, by running over him with his automobile. He claims, however, that there was not sufficient evidence from which the trial judge could find him guilty of first or second degree murder, and that a verdict of guilty of manslaughter was sufficient.

After 9 P. M. on October 14, 1955, the appellant, twenty-seven years of age, accompanied by his wife; a fellow workman, Gilbert Clay; and his wife, Minnie Clay, was driving his five passenger Buick automobile in a northerly direction on Bond Street in Baltimore City. He had reached a point about midway between Preston and Hoffman Streets where Ells-

worth Street, twelve feet in width, dead ends on the east side of Bond Street. At that time two men, Walter Lockett, aged thirty-three, and Luther Butler, aged twenty-nine, were walking across that street. In his first written statement to the police appellant said he was coming out of his house and saw the police. Before the police arrived Thomas Nolan came to his house and asked appellant the whereabouts of his car. He replied that it was around the corner. Nolan told him that he had seen his car in East Baltimore and heard his name over the radio. He did not ask Nolan what was said on the radio, or why his name was mentioned. He said he parked his car on Baker Street near Fulton Avenue and that was the last time he had seen it. In a later written statement the appellant said he saw four men crossing Bond Street from his left going from west to east. He came to a complete stop. One of the men came to his side, one stood in front of the car, and two went to the right side of the car. The one to the left of the car called him a vile name and asked: "What are you trying to do, run over me?" At the same time the man reached for the door. Appellant did not say anything but started to pull off, striking the man in front of the car. He was scared and drove fast up Bond Street to Lanvale Street, where he made a left turn into Spring Street. He turned right on Spring Street to North Avenue and made a left turn on North Avenue to Harford Avenue. He made another left turn on Harford Avenue to Oliver Street where he parked on Oliver Street between Caroline and Bond Streets. As he was going north on Spring Street he stopped at North Avenue and some man said to him: "You better stop because I have got your license number." This was where he hit a parked car to his left. He had turned his lights off when he hit Lockett. He turned them on again after he made a left turn on Lanvale Street after making the left turn on Bond Street. After parking his automobile he went to Caroline and Preston Streets, got a cab and went home. Sometime later his wife came home. Thomas Nolan came to his house and told him his automobile had been involved in an accident. He went outside with Nolan and at that time the police took him in custody. He did not tell Nolan he was involved in the accident. He

had had nothing to drink that night as he did not drink. Both of these written statements were admitted in evidence by stipulation. Appellant did not testify.

Luther Butler testified that about 7 P. M. on October 14th he and Lockett purchased a half pint of whiskey and, together with another man, drank it. They wanted another drink and started to cross Bond Street to Ellsworth Street when the appellant came across Preston Street driving his Buick automobile. As he and Lockett were crossing Bond Street the appellant came at "a pretty good speed" within five feet of them and stopped. When he stopped, Lockett said: "What are you trying to do, run somebody down?" The appellant then said: "Yes". When Lockett asked appellant what he was going to do, "run over somebody", appellant called Lockett a bad name and said: " 'I will run over you' and he did. And if I (Butler) didn't get out of the way he would have run over me too, I got the skin knocked off my leg. When I jumped out of the way I fell." The lights of the car were on. Butler further said: "Walter and I started across the street and knocked down going across the street, and when I seen the man started off with the car I jumped out of the way and knocked the skin off my knee to keep the man from hitting me." He further stated that appellant ran over Lockett, dragged him up the street about four and one-half or five blocks. He saw Lockett being dragged beneath the car and called to the driver to try to stop him, but he did not stop. He found Lockett on Dallas Street after he had been underneath the car. When he saw Lockett he had fallen from beneath the car. The appellant had gotten out and pulled Lockett from under the car and all of the clothes were dragged off of him and "practically all of the meat". He was unconscious. Lockett was not drunk because the half pint of whiskey had been consumed by three people and Lockett told him that he had no more money. On cross-examination he denied that he grabbed the door handle and further said there were not four men around the car, but only two, he and Lockett. He denied that he called the appellant a vile name. The autopsy report stated that the blood of the deceased was "negative for alcohol".

Gilbert Clay, a passenger in the automobile, testified that he did not remember what happened at Bond and Ellsworth Streets because he was asleep at the time. He woke up when his wife and appellant's wife were screaming to appellant to stop. After he awakened he also told the appellant to stop because he had heard that he had hit someone, and he told him to stop the car and see what he had hit. The appellant did not stop but drove a block or so further. When he stopped, appellant's wife and his wife got out of the car and appellant started up again. He was still in the car and appellant then drove through Dallas Street and hit a car. When appellant's car pulled up on the curb he could feel the weight drop loose from the car, "whatever was dragging under the car". He learned later that it was Lockett. When recalled to the stand, he said he had known Lockett about three years. After the appellant finally stopped the car and parked he asked him to find his wife and tell her to come home. Appellant told him that he was going to report to the police that his car was stolen.

Minnie Clay, a passenger in the car, testified that she recalled the happening at Bond and Ellsworth Streets. She had known Lockett for eight or ten years. He was a brother of her brother-in-law. Lockett and his friend were crossing the street and the appellant drove up and put on his brakes because he almost hit them. Lockett then stood in front of the car and asked appellant what he was trying to do, "run over them", and Lockett called appellant a vile name. Appellant then said: "If you don't get out of my way, I will." Appellant then started his car and "ran Lockett down". As he was driving up Bond Street she told him to stop the car but he told her to "shut up". She wanted appellant to stop because she knew he was dragging Lockett. She had a feeling that someone was under the car as Lockett had been standing in front of the car, and when she looked up she did not see him. On account of her "hollering" and crying her husband woke up and asked appellant to stop. She and appellant's wife got out on Bond and Federal Streets and went home. She said the car went about two blocks from where the accident happened before she and appellant's wife got out. She also

had known Butler before. She recognized both Lockett and Butler at the time. When asked if either Lockett or Butler came over to the car and had any words with appellant, she answered: "No, they didn't, only thing what Walter said, what he said in front of the car." They were stopped only a matter of minutes before appellant drove ahead and hit Lockett. She was in the back seat of the car. At the time she got out of the car with appellant's wife she did not see the body of Lockett. She does not know whether it was under the car or not. On cross-examination she stated that there were only two people crossing the street at the time and she was sitting on the same side of the car as the appellant. There was no one on the right side of the car.

Robert Page stated that he was standing across from where Ellsworth Street joins Bond Street. He saw Lockett and Butler coming across the street just when the car came up. The car almost hit Lockett so he said to the driver: "what are you trying to do, hit me, man?" He could not hear what the man inside the car said as he was too far away. Neither Lockett nor Butler went to the car. After Lockett was hit the car went up Bond Street and crossed Federal, then up Lanvale and made a left turn. From there he did not know where the car went. He saw Lockett under the car. He said he was a very good friend of Lockett and had known Butler for six or seven years. He had never seen the appellant before.

Officer Puller testified that he determined that the body of Lockett was dragged a total of 2,240 feet, about eight blocks, under the automobile. This was admitted by defendant's attorney. Six sketches were offered in evidence showing the route travelled by appellant's automobile, on which appeared rub marks on the surface of the streets traversed. It was stipulated that certain articles of clothing were found along the route at various points, marked on a diagram admitted in evidence. A photograph of appellant's automobile was admitted in evidence showing the undercarriage of the automobile, marks and blood thereon, and shreds of clothing attached thereto.

Appellant relies on Code, 1951, Article 27, Section 455:

"Every person causing the death of another as the result of the driving, operation or control of an automobile, motor vehicle, * * * or other vehicle in a grossly negligent manner, shall be guilty of a misdemeanor to be known as 'manslaughter by automobile, motor vehicle * * *'". It was said in Volume 8, *Maryland Law Review,* page 51, note 14, as quoted in *Hughes v. State,* 198 Md. 424, 431, 84 A. 2d 419: "'The common law standard of "gross negligence" as the minimum requirement for conviction of manslaughter when one unintentionally kills in the course of doing a dangerous act is carried over into the recent Maryland statute setting up the separate crime of manslaughter by automobile or other vehicle, Md. Code Supp. (1943) Art. 27, Sec. 436 A.'"

Murder is the unlawful killing of a human being with malice aforethought. Manslaughter is the unlawful killing of another without malice aforethought. The law presumes that all homicides are committed with malice aforethought, constituting murder. The burden is on the person accused to show circumstances of alleviation, excuse or justification to reduce the offense to manslaughter. Where murder is divided into grades such a homicide is presumed to be murder in the second degree and the burden to show that the killing was wilful, deliberate and premeditated is on the State if it desires to prove first degree murder. The essential difference between murder and manslaughter therefore is the presence or absence of malice.

In the absence of justification, excuse, or some circumstance of mitigation, malice may be inferred when there is an intent to inflict great bodily harm or when one wilfully does an act, the natural tendency of which is to cause death or great bodily harm.

For a homicide to be "wilful" there must be a specific purpose and design to kill. To be "deliberate" there must be a full and conscious knowledge of the purpose to kill. To be "premeditated" the design to kill must have preceded the killing by an appreciable length of time; that is, time enough to be deliberate. To justify a conviction of murder in the first degree the jury or court, sitting without a jury, must find the actual intent, the fully formed purpose to kill, with enough

time for deliberation and premeditation to convince that the purpose is not the immediate offspring of rashness and impetuous temper and that the mind has become fully conscious of its own design. It is not necessary that deliberation and premeditation shall have been conceived or shall have existed for any particular length of time before the killing. The existence of these elements must be judged from the facts of the particular case. If the killing is not the instant effect of impulse, if there is hesitation or doubt to be overcome, a choice made as a result of thought, however short the struggle between the intention and the act, the crime is sufficient to be characterized as deliberate and premeditated murder. *Chisley v. State,* 202 Md. 87, 95 A. 2d 577, and *Davis v. State,* 204 Md. 44, 102 A. 2d 816, where many authorities are cited and quoted by Judge Hammond. By statute in this State, Code, 1951, Article 27, Section 494: "All murder which shall be perpetrated by means of poison, or lying in wait, or by any kind of wilful, deliberate and premeditated killing shall be murder in the first degree."

It is provided by Rule 7, of the Criminal Rules of Practice and Procedure of this Court, as of October 1, 1955, that "When a criminal charge has been so tried by the court, an appeal may be taken as provided by law. Upon appeal the Court of Appeals may review upon both the law and the evidence to determine whether in law the evidence is sufficient to sustain the conviction, but the verdict of the trial court shall not be set aside on the evidence, unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." It is for this Court to decide only whether there was sufficient evidence from which the trial judge could fairly be convinced beyond a reasonable doubt that the appellant was guilty of murder in the first degree. *Grammer v. State,* 203 Md. 200, 225, 100 A. 2d 257, and cases there cited.

As to malice, the trial judge, who saw and heard the witnesses, could well have believed the testimony of Butler when, in answer to a question from Lockett whether appellant was trying to run over him, appellant answered "Yes". He could also well have believed the testimony of Minnie Clay to

the same effect. Although the appellant claimed that one of the men came to his side of the car, one stood in front of the car, and two went to the right side of the car, this evidence is flatly contradicted by Butler, Minnie Clay and Robert Page. There is no evidence that any threatening action was taken toward the appellant, other than his own statement. This is contradicted by these three witnesses. The trial judge could well find from the evidence that, without legal justification or excuse, the appellant intended to inflict great bodily harm to the deceased, the natural tendency of which was to cause death.

As to whether the act of the appellant was wilful and deliberate, with the purpose and design to kill, and appellant had a conscious knowledge of the purpose to kill, the trial judge could well find from the testimony of Butler, Minnie Clay and Robert Page that appellant started his car with the deliberate intention of running over Lockett. Two of these witnesses said that appellant threatened to do so if Lockett did not move. An automobile so driven is a dangerous instrumentality. In *Goldin v. State,* 38 Ga. App. 110, 142 S. E. 757, it was held that evidence that the accused deliberately drove an automobile against another was abundantly sufficient to sustain an assault with intent to murder. In *People v. Goolsby,* 284 Mich. 375, 279 N. W. 867, it was held that an automobile may be used so as to constitute a deadly weapon. In *Williamson v. State,* 92 Fla. 980, 111 So. 124, 53 A. L. R. 250, it was held that the term deadly weapon may denote an instrument so used as to be likely to cause death or great bodily harm. Hence it may include an automobile, especially within the meaning of statutes forbidding assault. The trial judge could also find from the evidence that the appellant deliberately dragged Lockett under his car for about eight blocks. Minnie Clay testified that she had a feeling that someone was under the car as Lockett was standing in front of it, and after he was hit she did not see him again. The trial judge could have believed Butler's testimony that he saw Lockett being dragged beneath the car and called to appellant to stop which he did not do. He also had the testimony of Gilbert Clay that he could feel whatever was dragging under the car drop. He

could also have believed the testimony of Robert Page who said he saw Lockett under the car. From the exhibits filed in the case it is evident that Lockett was hooked and suspended from the undercarriage of the automobile. From the fact that all of his clothing and "practically all of the meat" was dragged from his body, it is evident that the scraping on the streets was very severe. The shreds of clothing left on the automobile showed that the scraping was severe enough to separate Lockett from part of his clothing. Even after appellant let the two women out of the car he continued to drag the body a number of blocks. The trial judge could therefore well have believed that appellant knew the deceased was under the car while he was driving the eight blocks, and must have known that the result of such an action would result in Lockett's death. Even though an automobile may not be a deadly weapon, *per se,* yet if it is used in such a wilful or calculated manner to produce death, the trial judge may well find that death was intended.

As to the premeditation, after the appellant told Lockett that if he did not get out of the way he would run over him, a matter of minutes elapsed before he drove ahead and hit Lockett. As to the necessary time for deliberation, it was said by this Court in *Grammer v. State, supra,* page 225: "The appellant does not claim that he did not kill his wife. He claims that there was no evidence of premeditation which would support the verdict of first degree murder and that properly he can be found guilty only of second degree murder or manslaughter. Our task is only to decide whether the trial judge could fairly be convinced beyond a reasonable doubt of the guilt and the degree of guilt of the accused. *Berry v. State,* 202 Md. 62, [95] A. 2d 319; *Estep v. State,* 199 Md. 308, 86 A. 2d 470; and *Chisley v. State,* 202 Md. 87, 95 A. 2d 577. We think that there was evidence to justify the finding of premeditation. In one of his confessions, Grammer says, in referring to his wife's statement that he [thought] more of his job than he did of her: 'I thought of it for a while, stopped the car and got out. I guess I was just going to leave. I did not know exactly. I saw a piece of pipe and remember hitting her with it once.' There was opportunity

for reflection and decision, whether to kill or not to kill, in the length of time needed to get out of the car, pick up the piece of pipe, return to the car, and strike the fatal blows." In *Chisley v. State, supra,* page 108, it was said as to deliberation and premeditation: "There was evidence, in our opinion, which the jury could properly consider in determining whether there was intent to kill and deliberation and premeditation. The shooting was preceded by the discussion, brief as it was, about the ownership of the cigarettes. The jury could find that two or more shots were fired and that there was an appreciable interval between the first shot and the second, or more, and that the second was fired as Contee lay on the ground; the firing of two or more shots in such circumstances has been held by the Courts to be evidence for the jury of deliberation and premeditation." During the time appellant stopped his car before striking the deceased he had time to deliberate. During the time he drove the eight blocks with the deceased under the car, Luther Butler, Gilbert Clay, Minnie Clay and appellant's wife called to him to stop, which he did not do. Minnie and his wife screamed loud enough to awaken Minnie's husband. It is difficult to believe that appellant did not hear any of them. Appellant certainly had sufficient time to premeditate his actions which naturally would result in the death of Lockett.

We are therefore of opinion that there was ample evidence from which the trial judge could find beyond a reasonable doubt that appellant was guilty of murder in the first degree.

*Judgment affirmed, with costs.*