# HUGHES *v.* STATE
[No. 22, October Term, 1951.]

*Decided November 2, 1951.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*Edward J. Ryan* and *Horace P. Whitworth, Jr.,* for appellant.

*Ambrose T. Hartman, Special Assistant Attorney General,* with whom were *Hall Hammond, Attorney General,* and *Paul M. Fletcher, State's Attorney for Allegany County,* on the brief, for appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from a judgment of guilty rendered by the trial court, sitting without a jury, in a trial for manslaughter by automobile as the result of the killing of Thomas Robertson by a truck driven by the appellant.

Rule 7 (c) of the New Criminal Rules of Practice and Procedure dealing with the trial of criminal cases before the court without a jury provides that when a criminal charge has been so tried by the court, an appeal may be taken as provided by law. Upon appeal the Court of Appeals may review upon both the law and the evidence to determine whether in law the evidence is sufficient to sustain the conviction, but the verdict of the trial court shall not be set aside on the evidence, unless clearly erroneous, and due regard shall be given to the opportunity of the trial judge to judge of the credibility of the witnesses. Therefore, in the review of this case, this Court cannot set aside the verdict of the trial court on the evidence unless clearly erroneous. *Lambert v. State,* 196 Md. 57, 68, 75 A. 2d 327, 332. *Edwards v. State,* 198 Md. 132, 151, 81 A. 2d 631, 639 and opinion filed in the later case on October 5, 1951, on motion for re-argument, 198 Md. 152, 83 A. 2d 578.

The appellant, 24 years of age, was engaged with his father and brother in a business known as The Hughes Coal Company, in digging and mining coal about two miles west of the property of the George's Creek Coal Company in Allegany County. The Hughes Coal Company, non-union, hauled the coal from its mine to the tipple of the George's Creek Coal Company. On May 3rd, 1950, due to labor troubles, pickets of Union Miners were picketing the road leading to the tipple of the George's Creek Company in order to prevent or persuade others not to mine coal. That morning the appellant,

driving a truck belonging to the Hughes Coal Company, started for the office of the George's Creek Coal Company for the purpose of getting a check for coal which had been previously sold and delivered to that Company. The truck, a one and a half ton Chevrolet, was in good condition and the brakes operated on the hydraulic principle. The rear wheels were dual pneumatic. As Hughes drove up the road leading toward the office of the George's Creek Coal Company the road was picketed by a number of men. As he approached the place where these pickets were stationed, a representative of the United Mine Workers Union, a Mr. Dolphin, stepped in the road and held up his hand. Hughes did not stop his truck but proceeded in what was called "creeper gear", slower than a walk. Mr. Dolphin asked him "where he was going and if he was going for coal". When the defendant said: "No, I am going to see the superintendent", he was told to go ahead and he proceeded to that office.

When the appellant arrived at the mine office of the George's Creek Coal Company, a short distance from where the pickets were placed, he went in and obtained his check. When he came out, he found that a board with a number of long nails through it was fastened to the dual rear wheels on the outside and two other nails were imbedded in the same wheel. The tire was almost flat. He took the board off and put it on the floor of his cab for the purpose of taking it home and turning it over to the State Police. He said this did not make him "mad". "I thought it was childish for grown men to pull such a trick." He then started on his return journey home. The road leading from the mine office to the point of the accident sloped gradually upward for about one thousand feet. At the top the road made a curve to the right. After making this right turn the road sloped down at a grade of about 16%. When the appellant started down this hill, he said he shifted to second gear in order to go down the hill without using his brakes. The road then straightened out. In the

vicinity of the accident it had a hard surface and was approximately 16 feet in width. To the left of the road in the direction toward which the defendant was driving there was a soft shoulder of four or five feet. To the right of the hard surface there was a parking space in front of a cemetery. Cars were parked on both sides of the road. The deceased was killed while sitting on the fender or standing alongside of an automobile, belonging to Dempsey Nelson, parked parallel to the right side of the road and three or four feet off the hard surface. Appellant said as he approached the scene of the accident going about 15 miles per hour he had his truck under control.

He first saw the men in the road at a distance of forty or fifty feet. He said there were eight or ten men on the hard surface "milling around". The rest of the men were on the right and left side of the road. He was afraid there was going to be violence and he drove on down the road. He wanted to get through. When he was about thirty feet from the men he saw there was danger of hitting them. At that time he had his truck under control. He said he cut the truck to the right to keep from hitting the men on the left side of the road. He said he kept to the right to avoid the men on the left and when he saw the men on the left were not entirely clear from the road and when he was about thirty feet from them, he put his foot on the brake pedal and something gave away and he lost control of the truck. He kept the front end of the truck away from the cars on the right hand side but the rear wheels of the truck did not follow the line of the front wheels. He later learned that the rear of his truck struck the front of Dempsey Nelson's car, on which Thomas Robertson was sitting, and at the same time struck Mr. Robertson with the rear panel or post of the truck, causing his death. The spring of the truck broke and the drive shaft fell down digging holes in the road. He said when he applied the brakes the line that carries the hydraulic brake fluid to the rear wheels broke. He said: "When I

applied the brakes, I heard a noise, the truck gave a hop like up and down and then I heard it hit the other car." When the brakes were applied the truck did not stop but "hopped" up in the air. He tried to keep it on the road. He said: "Well, it struck the car, but I did not know it. I did not realize there was one there. The men were standing in front of the car and I could not see the car." He said he proceeded sixty or seventy feet before the truck stopped. He then noticed that the drive shaft was down and the right wheel was out of line.

The appellant got out of his truck, not knowing what had happened and had in his hands the board, with the nails in it, and complained to the men about placing the board with the nails under his wheels. He then learned of the injury to Mr. Robertson which later resulted in his death. Then he proceeded to a neighbor's house and the police were called.

Testimony was offered by the State that when Hughes came around the turn at the top of the hill, he accelerated the speed of the truck. All of the testimony in the case, except that of the appellant, was that the road was clear as appellant came down the hill and there was nothing to prevent the truck from traveling straight down the road.

Witnesses testified that Robertson was standing or sitting near or on the fender of Dempsey's automobile parked three or four feet from the right side of and parallel to the hard surfaced road. John Dolphin testified that the truck "came around the curve and then I could see it, he started down the hill he had slowed up and started down and made a cut in toward us. I hollered 'Look out'. I rolled off the car I was sitting on and while I was off the car I saw Robertson's hands go up in the air and he was rolled between the truck and the car. Dempsey Nelson testified that the appellant "swung off the road in the wide place and hit my car and those guys." "He just cut it off the road." John Kirk testified that after the defendant speeded

the truck up "it seemed like he cut to turn wide on the left and then he went to the right and hit these fellows." He was about four feet off the road when he hit the men. Alexander Barclay testified that he was further up the hill than Robertson. He said that he was three or four feet off the side of the road and the appellant tramped on the accelerator and the engine made such a terrific noise he turned his head. "The truck was coming so fast I just had time to move and was missed by inches when I jumped." He testified that the marks of the truck showed that the truck left the hard surfaced road about thirty or forty feet before it hit Robertson. He said the truck came right into the men and almost hit them all and on the way out it was going too fast to get out "that is when he clipped the car and when he hit it the springs flew in the road and the drive shaft fell on the road from the impact and it was digging the road all the way down." Melvin Cuthbertson testified that there was no obstruction in the road at the time and he was about three or four feet off the road. As soon as the defendant made the turn he turned the truck right into a "bunch of us men standing along that car, he turned the front end in. It all happened so quick when I did see him keep on coming the rest of us men got out of the way. I went forward and ran into a man in front of me and I threw up my hand in front of my face. I think I ran into Robertson." William Cameron testified "he came down pretty strong, he seemed to cut out pretty strong to the right off the middle of the road to where the cars were at." Lewis Reiber testified "when he got to the top of the curve coming around he speeded up and I saw him turn the wheel into where the parked automobiles were and the men standing there and there was nothing the matter with the truck at that time until he hit." Other testimony was presented by the State.

The testimony and marks in the road showed that the drive shaft did not drop down until after the Nelson car was struck. The front end of the truck cleared the

men and Nelson's automobile. However, the rear of the truck collided with the front of the automobile near which or on which which Robertson was sitting, killing Robertson and injuring Cuthbertson. Nelson's car was pushed back from the road eight or ten feet. The truck continued on down the road for a distance of about 120 feet after the accident. The drive shaft gouging in the road finally stopped it.

There is no testimony except that of the appellant himself that the road was obstructed in any way by the men "milling around". Other witnesses said that the men were all off the road. Appellant admits the road was straight. There is no testimony except that of the appellant that there was anything mechanically wrong with the truck just before the accident. After the accident when appellant was interviewed by the State's Attorney, he made no mention at all about anything being mechanically wrong with the truck before the accident. At the trial he explained this by saying that he was not asked that question.

The trial court found that there was no credible evidence to support the contention that there was some mechanical failure of the truck which caused the brakes to fail altogether. They found "much evidence to the contrary". The court found that this statement of the appellant did "not agree too well with what Hughes had said shortly after the accident when he was being questioned at the office of the State's Attorney. Nor is this borne out by the track his truck followed." The court found that "the failure of the motive power was after the rear end of the truck struck the Nelson car." The court further said: "We believe that Hughes was not apprehensive of mob violence as he went out, nor was he 'amused' over the spiked board incident. He was certainly angry. The average man in Hughes' place would have been. * * * We further conclude that, as he came down the hill, he turned the truck to the right intending only to scare the pickets grouped around the cars near the cemetery gate, by swerving near them

as he proceeded down the road in second gear. Unfortunately, he went too close and struck the two men and the Nelson car, not with the front of his truck, but with the right rear end. * * * In finding Hughes guilty of manslaughter, we want to make it clear it was not simply that he was angered because his legal rights had been violated. There were good grounds for his feeling of resentment. But this did not justify him in doing what he did with a dangerous instrumentality, and swerving a truck toward men on the side of the road."

Manslaughter by automobile is defined by Article 27, Section 436A, 1947 Supplement of the Code, as follows: "Every person causing the death of another as the result of the driving, operation or control of an automobile, motor vehicle, * * * or other vehicle, in a grossly negligent manner, shall be guilty of a misdemeanor to be known as 'manslaughter by automobile' * * *."

In the case of *Neusbaum v. State,* 156 Md. 149, 155, 143 A. 872, 875, Judge Offutt defined involuntary manslaughter as the taking of a life "unintentionally while needlessly doing anything in its nature dangerous to life, or who causes death by neglecting a duty imposed either by law or by contract, or in the course of committing a crime or even a civil wrong." The indictment in the case now before this Court follows the words of the statute, Article 27, Section 436A, *supra,* above quoted, and charged the killing "in a grossly negligent manner". It is said in Volume 8, *Maryland Law Review,* at page 51, footnote 14: "The common law standard of 'gross negligence' as the minimum requirement for conviction of manslaughter when one unintentionally kills in the course of doing a dangerous act is carried over into the recent Maryland statute setting up the separate crime of manslaughter by automobile or other vehicle, Md. Code Supp. (1943) Art. 27, Sec. 436A."

The cases of *State of Maryland v. Paul V. Chapman,* 101 F. Supp. 335, Daily Record, June 14, 1951, involved indictments for manslaughter for deaths in Prince George's County caused by the operation of an aircraft.

Judge Chesnut, in the United States District Court to which the cases had been removed for trial, after reviewing Article 27, Section 436A, *supra,* the common law, and the Maryland authorities, said in those cases: "In a succinct and well prepared brief counsel for the State has aptly expressed the matter in saying that the question is whether the conduct of the defendant, considering all the factors of the case, was such that it amounted to a 'wanton or reckless disregard for human life'." This seems to be the test to be applied under the manslaughter statute, *supra.*

In the case before this Court we cannot say under the evidence the trial court was clearly wrong in finding that the road was unobstructed and that the appellant, not by reason of any mechanical defect, swerved the truck toward the men on the side of the road in wanton and reckless disregard of human life. The judgment will therefore be affirmed.

*Judgment affirmed, with costs.*